STATE *ex rel.* RONALD LEE HAWKS

*v.*

JAIME E. LAZARO
*Director of Clinical Services*
*Huntington State Hospital*

(No. 13377)

Submitted September 6, 1973. Decided January 15, 1974.

418

*Robert B. Keiter* for relator.

*Chauncey H. Browning, Jr.,* Attorney General, *Phillip D. Gaujot,* Assistant Attorney General, for respondent.

NEELY, JUSTICE:

This original proceeding in *habeas corpus* challenges the constitutional validity of Chapter 27, Article 5, Section 4 of the *Code of West Virginia,* 1931, as amended. Petitioner, Ronald Lee Hawks, was committed to the Huntington State Hospital for an indeterminate period pursuant to a May 19, 1969 order and an August 29, 1973 order of the McDowell County Mental Hygiene Commission. On June 5, 1973 petitioner filed a petition in this Court for a writ of *habeas corpus ad subjiciendum* which alleged that petitioner has been illegally confined because: (1) petitioner was not afforded proper notice of the 1969 hearing; (2) petitioner was not present at the commitment hearing; and, (3) *Code,* 27-5-4, as amended, under which petitioner was committed is unconstitutional because that statute (a) permits commitment without the subject individual's presence at the hearing; (b) denies the subject individual the right to confront and cross-examine witnesses; (c) does not require proof beyond a reasonable doubt; (d) fails to require a record for appeal; and, (e) fails to provide for effective representation by counsel.

This Court granted a writ of *habeas corpus* on June 11, 1973, before the August 29, 1973 hearing was conducted before the McDowell County Mental Hygiene Commission. As this Court granted a writ to review the

proceedings of May 19, 1969, and to clarify the law concerning the proper interpretation of *Code*, 27-5-4, as amended, the facts surrounding both hearings will be discussed.

On May 1, 1969, Dr. Gaston de Lemos, Superintendent of the Huntington State Hospital, filed an application with the McDowell County Mental Hygiene Commission for the petitioner's involuntary hospitalization. This application was accompanied by a doctor's certificate stating that the petitioner was mentally ill and mentally retarded, and therefore, required long-term hospitalization.

On May 6, 1969, petitioner was examined by Dr. G. C. Morrison and Dr. Wilson O. Grimm, licensed medical doctors, who certified that the petitioner was mentally ill and dangerous to himself or others. On May 9, 1969, the McDowell County Mental Hygiene Commission sent the petitioner notice that a "hearing" had been scheduled for May 19, 1969, but the notice did not advise the petitioner of the nature of the proceedings, the allegations against him, or of his rights during the proceedings.

On May 13, 1969, the petitioner's social worker informed the Huntington State Hospital that petitioner desired to attend the hearing. However, on May 16, 1969, the Clinical Director of the Huntington State Hospital telephoned the McDowell County Mental Hygiene Commission and informed them that the petitioner's mental condition had deteriorated and that petitioner could not attend the scheduled hearing. After the Mental Hygiene Commission held a hearing at which an attorney was appointed guardian *ad litem* for the petitioner, and at which the written reports of Dr. Grimm and Dr. Morrison were received as evidence (although neither doctor appeared in person) the McDowell County Mental Hygiene Commission entered an order on May 19, 1969 committing the petitioner to the Huntington State Hospital for an indeterminate period. No record was kept of these proceedings.

The petitioner was not present at the May 19, 1969 commitment proceedings and did not consent to representation by the appointed guardian, nor did he have an opportunity to consult with the guardian before the hearing. It appears that the guardians *ad litem* appointed at both the 1969 and 1973 hearings envisaged their roles as that of guardians rather than adversaries, as there is no evidence to suggest that they contested petitioner's commitment. Since the entry of the May 19, 1969 commitment order, the petitioner has remained involuntarily confined at the Huntington State Hospital.

It is admitted by respondent that at the May 1969 hearing the petitioner was not present; however, the respondent maintains that this defect was cured at the August 29, 1973 hearing at which the petitioner was present in person. Although the State has attempted to correct many of the obvious procedural errors in the May 1969 hearing, the Court is of the opinion that this case, taken in its entirety, presents a justiciable controversy of substantial public importance. The respondent cannot deprive citizens of court review of a widespread violation of constitutional rights by curing procedural irregularities in individual cases after they have been brought to the court's attention. See, *Friend v. U. S.,* 128 U.S. App. D.C. 323, 388 F.2d 579 (C.A.,D.C. 1967). The petitioner successfully challenges the constitutional validity of certain part of *Code,* 27-5-4, as amended, and develops facts concerning his own commitment which indicate that other parts of *Code,* 27-5-4, as amended, which are constitutional, have been generally applied in an unconstitutional manner. Therefore, the Court is persuaded that a need exists for judicial interpretation of ambiguous language which has apparently invited widespread abuse. The relevant portions of *Code,* 27-5-4, as amended, are as follows:

> "Proceedings for the involuntary hospitalization of an individual may be commenced by the filing of a written application and the certificate or statement hereinafter provided with the clerk

of the county court of the county of which the individual is a resident or where he may be found, by his parents or parent, guardian, spouse, adult next of kin or friend, or by a physician, a health officer or public welfare caseworker familiar with the case of the individual, or the head of any institution in which such individual may be. Such applicant shall file with his application the certificate of a physician stating that in his opinion the individual is mentally ill or mentally retarded and should be hospitalized or a statement by the applicant that the individual has refused to submit to examination by a physician.

"Upon receipt of an application, the clerk shall give notice thereof to the individual and to the individual's spouse, parents or parent or guardian, or if the individual does not have a spouse, parents or parent or guardian, to the individual's adult next of kin. Such notice shall be given within fifteen days after receipt of the application by the clerk and shall be transmitted to such person or persons at his or their last known address by registered or certified mail, return receipt requested.

"As soon as practicable after notice of the commencement of proceedings is given, the mental hygiene commission shall appoint two physicians to examine the individual and report to the mental hygiene commission their findings as to the mental condition of the individual and his need for custody, care or treatment in a hospital.

"If the designated physicians report to the mental hygiene commission that the individual has refused to submit to an examination, the mental hygiene commission shall order him to submit to such examination. Such an order may be enforced by the issuance of a warrant ordering the individual to be taken into custody pending examination by the designated physicians. All such warrants shall be signed by the clerk on order of the mental hygiene commission and directed to the sheriff of the county or to any constable of any district thereof, or to a special

constable appointed for the purpose and named therein.

"If the report of one or both of the designated physicians is to the effect that the individual is mentally ill or mentally retarded, the mental hygiene commission shall forthwith fix a date for and have the clerk of the county court give notice of the hearing to the individual, the applicant or applicants, and to the individual's spouse, parents or parent or guardian, or if the individual does not have a spouse, parents or parent or guardian to the individual's adult next of kin. Such notice shall be transmitted to such person or persons at his or their last known address by registered or certified mail, return receipt requested, and shall be received by such person or persons not less than five days prior to the date of the hearing.

"The individual, the applicant, and all persons entitled to notice of such hearing, shall be afforded an opportunity to appear at the hearing, to testify, and to present and cross-examine witnesses, and the mental hygiene commission may in its discretion receive the testimony of any other person. The individual shall not be required to be present, and all persons not necessary for the conduct of the proceedings shall be excluded, except that the mental hygiene commission shall admit and hear persons having a legitimate interest in the proceedings. The hearings shall be conducted in as informal a manner as may be consistent with orderly procedure. The mental hygiene commission shall receive all relevant and material evidence which may be offered and shall not be bound by the rules of evidence. The mental hygiene commission shall appoint a guardian ad litem who shall be a competent attorney, for the individual and said guardian shall be present at the hearing and protect the interests of the individual. The mental hygiene commission may allow such guardian ad litem a reasonable fee for his services which shall be paid by the county court to the extent that funds are made available in the county budget.

"If, upon completion of the hearing and consideration of the record, the mental hygiene

commission finds that the individual is mentally ill or mentally retarded, and:

"(1) Because of his illness or retardation is likely to injure himself or others if allowed to remain at liberty, or

"(2) Is in need of custody, care or treatment in a hospital and, because of his illness or retardation lacks sufficient insight or capacity to make responsible decisions with respect to his hospitalization, and

"(3) Is a resident of the county in which the hearing is held, the mental hygiene commission may order his hospitalization for an indeterminate period or for a temporary observation period not exceeding six months.

"If the order is for a temporary period the mental hygiene commission may at any time prior to the expiration of such period, on the basis of report by the superintendent of the state hospital in which the patient is confined and such further inquiry as may seem appropriate, order indeterminate hospitalization of the patient or dismissal of the proceeding.

"If the mental hygiene commission finds that the individual is not mentally ill or mentally retarded, the proceeding shall be dismissed. If the commission finds that the individual is mentally ill or mentally retarded but because of such illness or retardation is not likely to injure himself or others if allowed to remain at liberty, the proceedings shall be dismissed. If the commission finds that the individual is mentally ill or mentally retarded and that because of such illness or retardation is not likely to injure himself or others if allowed to remain at liberty and that such individual has sufficient insight or capacity to make responsible decisions with respect to his hospitalization, the proceeding shall be dismissed."

The respondent defends the constitutional validity of *Code*, 27-5-4, as amended, upon the grounds that the provisions contained in that section are designed to protect incompetent persons, and that under the doctrine

of *parens patriae* the State of West Virginia need not accord an individual the same procedural safeguards in an action in his own best interests that would be mandated in ordinary civil or criminal litigation. Except in very limited circumstances, to be discussed later, the Court rejects this expansive application of *parens patriae* on the grounds that such an expansive application offends current standards of due process. Due process of law, as contemplated by Article III, Section 10 of the *Constitution of the State of West Virginia* and the Fifth Amendment to the *United States Constitution* is a continuously evolving concept. Procedural due process at any moment in modern legal history represents the most advanced mechanisms for fairness which juridical science can create, and as the source of most legal experience is found in adversary criminal and civil litigation, jurisprudence has developed its most advanced standards and reached its highest sophistication in these areas. Therefore, the procedures employed in civil and criminal litigation establish the norm for all judicial proceedings, and any deviation from that norm must be strictly justified, not merely by theoretical principles, but also by experience. In much the same way that the Tower of London has endured as an architectural monument since medieval times, the doctrine of *parens patriae* has endured from pre-medieval times as a monument to the State's power over the private lives of its citizens; however, in the face of constitutional principles which are antithetical to the doctrine of *parens patriae,* mere endurance no more commends the logic of that doctrine to our favorable attention than a similar endurance commends the lurid history of the Bloody Tower.

The earliest recognition in English law of the doctrine of *parens patriae* with reference to mental incompetents is in the document known as *Praerogativa Regis,* which is believed to come from the early years of Edward I. (POLLOCK AND MAITLAND, *History of English Law,* Vol. I, page 481). *Praerogativa Regis,* in turn was either based on or paralleled the Roman law, which went even farther

than medieval English law in its grant of power to the State over incompetents. Roman law provided that if a man by notorious prodigality were in danger of wasting his estate, he could be declared *non compos mentis,* and committed to the care of curators or tutors by the praetor, BLACKSTONE, *Commentaries,* Book I, Chapter 8. According to Blackstone, the Roman law said specifically:

> "Solent praetores, si talem hominem, qui neque tempus neque finem expensarum habet, sed bono sua dilacerando et dissipando profundit, curatorem ei dare, exemplo furiosi: et tamdiu erunt ambo in curatione, quamdiu vel furiosus sanitatem, vel ille bonos mores, receperit."

The flavor of this passage indicates that the Roman law concerned itself primarily with persons of property and not with the general population. The same criticism exists with regard to medieval English law where one can reasonably believe the early doctrine of *parens patriae* was conceived in avarice and executed without charity. The romanticized accolades which Victorian and Edwardian writers such as Pollock, Maitland, and Macaulay accorded medieval law for its protection of the laboring classes are unjustified. (See, F.S.C. Milsom, "Introduction," POLLOCK AND MAITLAND, *History of English Law,* Cambridge University Press, 1968, on the subject of the unreported jurisdiction of manorial courts.) Until the first quarter of the Twentieth Century, the common man was but a cipher to the law, in spite of the hard work of social reformers. Early reported English law primarily adjudicated disputes among men of property, and the early development of *parens patriae* was more a state fiscal policy than a humanitarian doctrine.

The king's rights, (and only incidentally his responsibilities) with regard to lunatics were first codified in 1324 in 17 Edw. II. Statute 1, c.10 which provided that the king should have the custody of lunatics, and conserve their lands and the profits of the lands for their use, until such time as the lunatics recovered their faculties. This statute accomplished but one innovation in medieval

law; it provided that the king was to make no profit from the wardship of the land of lunatics. The entire statute dealt at length with feudal fiscal policy and the king's revenue, and the provision with regard to lunatics was apparently inserted by the propertied class for their own protection, as much of the sovereign's revenue came from feudal incidents resulting from the king's control of persons under disabilities, the most well known of which were the wardships and marriages of the minor heirs of his tenants in chief (or of inferior tenants holding directly of the sovereign on land known as the "ancient demesne") for which there was a thriving open market in much the same sense that there is a futures market today. As *Praerogativa Regis* is basically a tax statute clarifying feudal incidents, it is as difficult to find the fountainhead of a modern humanitarian doctrine in 17 Edward II, Chapters 9 and 10 as it is to find some great state beneficence underlying the modern *Internal Revenue Code*. Chapter 10 was at best a limitation on the avaricious designs of the sovereign in the case of lunatics, which had been given unbridled license by Chapter 9 of the same statute with regard to the lands of born idiots or natural fools.

Under Chapter 9 the custody of a born idiot was also in the hands of the king, but here the king was permitted to take the profits of the lands, without waste or destruction, conditioned only upon his providing the idiot or fool with certain necessities of life. The king's wardship over natural fools was a device for augmenting the treasury, for it was a foregone conclusion that if the king did not assume jurisdiction over fools, their immediate temporal lords would take jurisdiction, in the same way that immediate temporal lords were entitled to other wardships of persons under disability, such as orphaned minors and certain unmarried women. While jurisdiction over natural fools augmented the king's treasury, jurisdiction over lunatics, (*i.e.*, those persons who were at one time in their right mind but lapsed into periods of insanity) was primarily a device to protect family lands.

Under feudal land law, heirs were established by birth and not by will, which frequently left a valuable life estate in the hands of a fool, idiot, or lunatic. The royal wardship for lunatics from which the king could take no profit was evidently selected by parliament because the king could be better controlled than other feudal magnates, in that if his agents were not perfect in their observance of high fiduciary standards, they were, at least, preferable to the various alternatives which medieval society offered, namely guardianship in the lunatic's immediate temporal lord or alternatively guardianship in his greedy relatives.

The ineluctable conclusion follows that the early development of *parens patriae* was in no way evidence of the sovereign's solicitude for the welfare of unfortunate subjects, but rather was merely the natural result of the king's need for revenue combined with medieval restraints upon the alienation of land which left valuable life estates in the hands of born incompetents under a system of feudal as opposed to modern allodial tenure, for in those days it can be said with ironic force that the law was no respecter of persons.

Therefore, it can be seen that the doctrine of *parens patriae* has been suspect from the earliest times. While well-meaning people frequently attempted to operate under it for the benefit of their fellowmen, it has as often been used as a justification for greedy actions on the part of relatives or for the removal of unwanted or trouble-some persons. Its further development in Nineteenth Century American law is almost impossible to trace with accuracy because of the diversity of jurisdictions, each reflecting a particular approach to the care of the mentally ill. However, the doctrine can be found as the basis for various commitment procedures in the Nine-teenth Century, when the states took steps to protect themselves from the dangerously deranged. The mental health commitment statutes of a majority of the states, including *Code*, 27-5-4, as amended, in West Virginia,

evince a combination of concerns, some of which are justified by the police power and others of which must be justified, if at all, under *parens patriae*. The mixture of the two doctrines is found in the early case of *In the Matter of Josiah Oakes,* 8 Massachusetts Law Reporter, 123 (1845) where the Court apparently made no distinction between legitimate police powers and laws of humanity. In the *Oakes* case, the Massachusetts Supreme Court said:

> ". . . the right to restrain an insane person of his liberty is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others. . . . And the necessity which creates the law, creates the limitation of the law. The questions must then arise in each particular case, whether a patient's own safety, or that of others, requires that he should be restrained for a certain time, and whether restraint is necessary for his restoration or will be conducive thereto. The restraint can continue as long as the necessity continues. This is the limitation, and the proper limitation."

The doctrine of *parens patriae* may have had a certain transitory validity after the construction of large state hospitals (of which our own Weston State Hospital, which was begun before the War between the States, is a good example) as it appears that during the Nineteenth Century insane persons were expelled from towns along with paupers generally, and wandered about in bands, falling prey to the cruelties of an unsophisticated society which frequently equated both mental illness and idleness with moral turpitude. *Lessard v. Schmidt,* 349 F. Supp. 1078 (D.C., E.D. Wisc., 1972); A. Deutsch, *The Mentally Ill in America,* 1949 Ed., pp. 419-20. It would appear from *Blackstone's Commentaries,* which was a standard reference work at the conclusion of the Eighteenth Century that the law concerning paupers and vagabonds, among whom were often found the insane and retarded, was extremely harsh, as demonstrated by the following summary:

" . . . [I]n our own law, all idle persons or vaga-
bonds, whom our ancient statutes describe to be
'such as wake on the night, and sleep on the
day, and haunt customable taverns, and ale-
houses, and routs about; and no man wot from
whence they come, ne whether they go;' or such
as are more particularly described by statute
17 Geo. II. c. 5, and divided into three classes, idle
and disorderly persons, rogues and vagabonds,
and incorrigible rogues. . . . all these are offenders
against the good order, and blemishes in the
government, of any kingdom. They are therefore
all punished, by the statute last mentioned; that
is to say, idle and disorderly persons with one
month's imprisonment in the house of correction;
rogues and vagabonds with whipping and im-
prisonment not exceeding six months; and
incorrigible rogues with the like discipline and
confinement, not exceeding two years; the breach
and escape from which confinement in one of an
inferior class, ranks him among incorrigible
rogues; and in a rogue (before incorrigible)
makes him a felon, and liable to be transported
for seven years." Book IV, Ch. 8, p. 169.

It was primarily for persons who because of mental illness
would appear to be vagabonds that the states determined
to erect mental institutions and to confine the mentally
ill for their own safety. With the exception of persons
with property, whom relatives sought to have committed
in order to preserve family estates, the Nineteenth
Century law of mental illness concerned itself with the
seriously deranged or retarded who were either dangerous
to society or completely unable to care for themselves.

The theoretical beneficence of the state with regard
to its citizens has been used in justification of state
custody or guardianship from the medieval period to our
own day, although the disparity between the theory of
beneficence and the practice of cruelty and inhumanity
has often been the subject of literature (see, Dickens,
*Oliver Twist*; Bronte, *Jane Eyre*). There is persuasive
evidence that the alleged improvement in treatment in
modern state facilities from medieval times to our own

is more myth than reality, see, *Wyatt v. Stickney,* 325 F. Supp. 781, (D.C. Ala. 1971) and that at the current low level of sociological and psychological knowledge, combined with the current parsimonious level of governmental support for state institutions the state and its officers have a limited therapeutic role and a predominantly custodial role.

In recognition of the conditions which exist at state institutions, numerous courts have recently required the state to demonstrate a reasonable relationship between the alleged harm which a person is likely to do to himself and the treatment designed to ameliorate the illness which may cause that harm. For example, in *Darnell v. Cameron,* 121 U.S. App. D.C. 58 [1965] 348 F.2d 64 (C.A., D.C. 1965) the Court stated that mandatory confinement rests upon the supposition of the necessity for treatment, and that if there is no treatment, a committed individual can bring a *habeas corpus* proceeding to question the constitutionality of his involuntary hospitalization; also, in *Medberry v. Patterson,* 188 F. Supp. 557, (D.C., Colo. 1960) the Court held that an involuntarily committed patient is entitled to treatment, and lack of such treatment cannot be justified by a lack of staff or facilities. Accordingly the ancient doctrine of *parens patriae* is in full retreat on all fronts except in those very narrow areas where the state can demonstrate, as a matter of fact, that its care and custody is superior to any available alternative. *In Re Gault,* 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *In Re Simmons Children,* 154 W.Va. 491, 177 S.E.2d 19 (1970); *In Re Willis,* 157 W.Va. 225, 202 S.E.2d 109 (decided December 11, 1973). Therefore, in determining whether there is any justification under the doctrine of *parens patriae* for deviation from established due process standards, it is appropriate for this Court to consider that the State of West Virginia offers to those unfortunates who are incarcerated in mental institutions Dickensian squalor of unconscionable magnitudes.

In 1970 West Virginia spent $7.19 per day per patient in public mental hospitals, thus ranking 49th among the

states. Colorado, on the other hand, spent $42.32 per day per patient, and the United States average was $14.89 per day. Although allegedly, under the *parens patriae* doctrine, the purpose of institutionalization for mental patients in West Virginia is rehabilitation, in 1970 only 33.1 physcian hours per week were recorded per one hundred patients, and among the fifty states, West Virginia ranks 47th in physician hours per week. The United States average is 75 physician hours per week. The annual per capita maintenance expenditure in West Virginia in 1970 was $6.27 as compared to a national average of $9.31, and while in 1970 the average percentage of the state budget expended by the respective states for the care of the mentally ill was 2.2 percent, West Virginia spent only 1.52 percent of its state budget in this category, which placed it 32nd among the states. In addition, as compared with the other states, West Virginia ranked 49th in the ratio of professional employees to patients, and 48th in the ratio of total staff to patients. (*Eleven Indices,* Joint Information Service of the American Psychiatric Association and the National Association for Mental Health, Washington, D.C., 1971.) The dry facts concerning financial support are hardly as persuasive as the narrative description of the physical conditions reported by members of the West Virginia Legislature in 1972.

> "The Committee was thoroughly disgusted at the deplorable conditions existing at this facility. Dirt and filth and foul odors were everywhere. Daily housekeeping and routine maintenance were not being performed. There was a need for screens, flies were swarming and garbage cans were uncovered and overflowing. While the hospital could undoubtably (*sic*) use additional housekeeping and maintenance people, the present personnel have become dilatory in their work. . . .

> "Security is a problem at several state hospitals, but is particularly acute at Weston. . . . There were 91 elopements from the hospital in 1971 and 35 during 1972 up to the time of inspection.

"At the time of inspection, the Committee observed patients administering drugs to patients . . . ." *1972 Annual Report of the Special Committee to Visit and Inspect State Hospitals and Institutions.* (SRC33, 1971)

The parsimonious level of financial support is again reflected in the rate of rehabilitation of mental patients. In 1972-73 the average length of stay for involuntarily committed resident patients in West Virginia mental institutions was 15.91 years, and as of June 30, 1973, of 1,873 involuntarily committed patients, 1,119 patients had been institutionalized for over ten years. (State of West Virginia, Department of Mental Health, Records and Statistics Section.) In West Virginia as of 1969, only 9.8 percent of total rehabilitations achieved in federal-state programs were rehabilitated mental illness clients, which ranked West Virginia 45th among the states in this category. (*Eleven Indices,* 1971 Edition, *supra.*) Recent research demonstrates that institutionalization is frequently the worst treatment which can be provided a person suffering from mental problems. Herz, et al., "Day Versus Inpatient Hospitalization: A Controlled Study" *American Journal of Psychiatry* (April, 1971); Cserr, Chairman, *Final Report of the Committee on Community-Based Care,* Task Force on the Adult Mentally Ill (Massachusetts, 1973). All of these statistics and observations give persuasive support to the following observations of Albert Deutsch, which suggest that the hospitalization of the mentally ill under current conditions may inflict positive harm on the patients:

"The enormous disability associated with mental illness is, to a large extent, superimposed, preventable, and treatable. . . . Disability is superimposed by rejection mechanism stemming from cultural attitudes. . . . Hospitalization as such is an important cause of disability. . . . The best treatment-minded state hospitals perform a disabling function.

"We can no longer tolerate the paradox of depriving mental patients of their civil rights in

the name of hospital treatment when we know that it is not only unnecessary for security but harmful to potential recovery. . . ." *Hearings on Constitutional Rights of the Mentally Ill Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary,* 87th Cong. 1st Sess. pt. 1, at 44, 46.

Article III, Section 10 of the *West Virginia Constitution* and the Fifth Amendment to the *United States Constitution* provide that no person shall be deprived of life, liberty or property without due process of law. This Court recognized in the case of *Schutte v. Schutte,* 86 W.Va. 701, 104 S.E. 108 (1920) that "liberty, full and complete liberty, is a right of the very highest nature. It stands next in order to life itself. The constitution guarantees and safeguards it. An adjudication of insanity is a partial deprivation of it." The Supreme Court of the United States has implicitly recognized that the determination of due process standards is a mixed question of law and fact. In the case of *Kent v. United States,* 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), the Supreme Court discussed the factual circumstances surrounding the incarceration of juveniles, and on the basis of the existing facts repudiated the doctrine of *parens patriae* as a justification for not according juveniles the full procedural due process rights which would be theirs in a criminal proceeding. The Court said at 383 U.S. 555; at 86 S. Ct. 1054:

> "While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults. There is much evidence that some juvenile courts, including that of the District of Columbia, lack the personnel, facilities and techniques to perform adequately as representatives of the State in a *parens patriae* capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there

> may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children."

In other jurisdictions, as indicated above, judicial notice has been taken of sociological and psychological research which demonstrates the actual state of the science of rehabilitation as well as the theoretical legal concept of *parens patriae,* and it has been almost uniformly held in the modern cases that the body of law which has developed upon an expansive definition of that doctrine is improvident.

No better example can be found than the area of mental health in which to heed the warning of Mr. Justice Brandeis in his dissent in *Olmstead v. U.S.,* 277 U.S. 438, 479, 48 S. Ct. 564, 572-573, 72 L. Ed. 944 (1928) where he said:

> "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning, but without understanding."

Additionally this warning was underscored in the following language of *Heryford v. Parker,* 396 F.2d 393, 396 (C.A. 10th Cir., 1968) :

> "* * * [W]e have a situation in which the liberty of an individual is at stake, and we think the reasoning in Gault, emphatically applies. It matters not whether the proceedings be labeled 'civil' or 'criminal' or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration— whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands observance of the constitutional safeguards of due process. Where, as in both proceedings for juveniles and mentally deficient persons, the

state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process . . . ."

I

For the foregoing reasons, we hold unconstitutional the standard enunciated in *Code*, 27-5-4 (2), as amended, which permits involuntary hospitalization if the individual:

"(2) Is in need of custody, care or treatment in a hospital and, because of his illness or retardation lacks sufficient insight or capacity to make responsible decisions with respect to his hospitalization . . . . "

The State is unable to demonstrate any compelling State interest under the police power for hospitalizing a person in his own best interests. Society abounds with persons who should be hospitalized, either for gallbladder surgery, back operations, corrective orthopedic surgery, or other reasons; yet, in these areas society would not contemplate involuntary hospitalization for treatment. As *Code*, 27-5-4, as amended, permits incarceration, due process as developed with regard to criminal statutes mandates that the grounds for incarceration be stated with specificity. The standard of hospitalization for the benefit of the individual leaves an entirely subjective determination for the committing authority which violates due process because it forecloses a meaningful appeal and places the individual in jeopardy of losing his freedom without providing an objective standard against which the committing authority's determination can be measured. See, BRAGINSKY AND BRAGINSKY, "Psychologists: High Priests of the Middle Class," *Psychology Today*, December, 1973; ROSENHAND, "On Being Sane in Insane Places," *Science*, January, 1973.

The lack of a specific standard always creates opportunities for abuse, frequently in the form of an invitation to the greedy relatives of prosperous citizens to curtail prodigal or eccentric expenditures through the use of

involuntary commitment, and as the historical material dicussed earlier implies, the initial motivation for the *parens patriae* doctrine in our law came from exactly such an urge to conserve valuable property.

Modern welfare programs, community mental health facilities and private social service agencies have eliminated the problems of actual starvation and persecution of the mentally disturbed which were prevalent in the latter half of the Nineteenth Century. Accordingly, it is possible for many nonviolent people, even those who suffer from a mental disease or retardation to such an extent that they are unable to earn a living, to live outside of an institution, and when these people prefer to do so, regardless of the wisdom of their decision, or the strength of their reasoning powers, the constitution guarantees them the right to follow their own desires.

Notwithstanding the invalidity of *Code,* 27-5-4(2), as amended, we hold that *Code,* 27-5-4(1), as amended, does establish reasonable and definite criteria for involuntary hospitalization when it permits the State to hospitalize an individual if:

> "(1) Because of his illness or retardation [he] is likely to injure himself or others if allowed to remain at liberty . . . ."

Society is entitled to protect itself against predatory acts on the part of anti-social people, regardless of the cause of their anti-social actions. Therefore, if the State can prove that an individual is likely to injure others if left at liberty, it may hospitalize him. The State is also entitled to prevent a person from injuring himself in the very specific sense of doing physical damage to himself, either actively or passively. Therefore, when it can be demonstrated that an individual has a self-destructive urge and will be violent towards himself, or alternatively that he is so mentally retarded or mentally ill that by sheer inactivity he will permit himself to die either of starvation or lack of care, then the State is entitled to hospitalize him. The State would also be permitted, under

the Constitution, to hospitalize a person who suffers from a mental illness or retardation which is likely to produce some form of injury other than direct physical injury, if the type of injury were definitely ascertainable, and if the State had a treatment program which it could be demonstrated offered a reasonable likelihood of ameliorating the illness or condition.

## II

In the case for decision, the petitioner challenges the validity of his hospitalization under the May 1969 commitment order upon the grounds that he did not receive adequate notice. *Code,* 27-5-4, as amended, provides for notice as follows:

> "Upon receipt of an application, the clerk shall give notice thereof to the individual and to the individual's spouse, parents or parent or guardian, or if the individual does not have a spouse, parents or parent or guardian, to the individual's adult next of kin. Such notice shall be given within fifteen days after receipt of the application by the clerk and shall be transmitted to such person or persons at his or their last known address by registered or certified mail, return receipt requested.

> . . .

> "If the report of one or both of the designated physicians is to the effect that the individual is mentally ill or mentally retarded, the mental hygiene commission shall forthwith fix a date for and have the clerk of the county court give notice of the hearing to the individual, the applicant or applicants, and to the individual's spouse, parents or parent or guardian, or if the individual does not have a spouse, parents, or parent or guardian, to the individual's adult next of kin. Such notice shall be transmitted to such person or persons at his or her last known address by registered or certified mail, return receipt requested, and shall be received by such person or persons not less than five days prior to the date of the hearing."

The notice provisions of *Code,* 27-5-4, as amended, are constitutional, although in the case of the petitioner they were unconstitutionally applied. Notice contemplates meaningful notice which affords an opportunity to prepare a defense and to be heard upon the merits. Therefore, any notice given to advise a person that commitment proceedings are being brought against him must contain a detailed statement of the grounds upon which the commitment is sought, as well as the underlying facts which support the applicant's conclusion that the individual should be committed. It should be noted that the statute provides for two separate notices, one before examination by physicians, and the other before the hearing scheduled as the result of an unfavorable report filed with the commission by the examining physicians. In order to meet constitutional standards, the first notice, in addition to advising the individual of the specific grounds on which the application is based, must also advise the individual of his right to counsel, and that if he cannot afford counsel, counsel will be appointed for him. see, *Petition of Rohrer,* 353 Mass. 282, 230 N.E.2d 915 (1967); *Thornton v. Corcoran,* 407 F.2d 695, 132 U.S. App. D.C. 232 [1969].

### III

Petitioner further challenges the May 1969 order on the related grounds that he was not permitted to be present and to defend himself in person. In criminal prosecutions it has long been the law that a defendant is entitled to be present at every stage of the proceedings and to cross-examine and confront witnesses. *Pointer v. Texas,* 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State v. Vance,* 146 W.Va. 925, 124 S.E.2d 252 (1962). In the case of *In Re Gault, supra,* the United States Supreme Court extended the right to be present and to confront witnesses to juvenile court proceedings, and rejected the argument that because the State is acting in the best interests of the individual *parens patriae* justifies proceedings which do not conform to the procedural

standards which are applicable to criminal proceedings. In *Gault*, the Supreme Court refused to distinguish between juvenile and criminal proceedings on the basis of whether they were "civil" or "criminal" actions.

The right to confront witnesses in all cases involving deprivation of liberty was confirmed in the case of *Specht v. Patterson*, 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967) which involved proceedings under the Colorado Sex Offenders Act. The Supreme Court at 386 U.S. 610 at 87 S. Ct. 1212, said:

> "Under Colorado's criminal procedure, here challenged, the invocation of the Sex Offenders Act means the making of a new charge leading to criminal punishment. The case is not unlike those under recidivist statutes where an habitual criminal issue is 'a distinct issue' [citations omitted] on which a defendant 'must receive reasonable notice and an opportunity to be heard.' [citations omitted] Due process, in other words, requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal which is allowed."

Therefore, notwithstanding the fact that the West Virginia Statute on involuntary hospitalization is denominated a "civil" statute, as it places in jeopardy an individual's basic right to liberty the same standards of notice and personal confrontation of witnesses are required in a commitment hearing as would be applicable in a criminal prosecution. The subject individual, just as a criminal defendant, must be present in person and cannot waive that right. *Martin v. Settle*, 192 F. Supp. 156 (D.C.,Mo. 1961); *In Re: Wellman*, 3 Kan. App. 100, 45 P. 726 (1896).

## IV

*Code*, 27-5-4, as amended, also provides:

> "The hearings shall be conducted in as informal a manner as may be consistent with orderly

> procedure. The mental hygiene commission shall receive all relevant and material evidence which may be offered and shall not be bound by the rules of evidence."

We hold that this provision of the statute is unconstitutional because it contemplates the submission of documents or reports without the authors of those documents being present during the hearing. The introduction of this type of hearsay evidence denies the individual an opportunity to confront and cross-examine witnesses contrary to Article III, Section 14 of the *West Virginia Constitution* and the Sixth and Fourteenth Amendments of the *United States Constitution. Pointer v. Texas, supra; Specht v. Patterson, supra.* In *Darnell v. Cameron, supra,* the court held that an individual is constitutionally entitled to have the question of competency tested by an adversary hearing, rather than on opinions, conclusions, or certificates of mental incompetency. In *Miller v. Blalock,* 411 F.2d 548 (C.A. 4th Cir. 1969), the court held that commitment based on a physician's report that was entirely conclusory, with no findings of underlying facts, violates due process. Accord, *Sas v. State of Maryland,* 334 F.2d 506 (C.A. 4th Cir. 1964).

## V

This Court also sustains petitioner's challenge to both commitment orders on the grounds that he was denied effective representation by counsel. *Code,* 27-5-4, as amended, provides for the appointment of a guardian *ad litem* who shall be a competent attorney. In order for the procedural requirements of notice and confrontation of witnesses to be meaningful, the individual must be represented by counsel. *Code,* 27-5-4, as amended, is not unconstitutional in this regard because it provides for a guardian *ad litem*; however, the appointed guardian must serve the function of an adversary, and to the extent both authorized and mandated by Canons 5 and 7 of the *Code of Professional Responsibility,* the guardian has a duty to

the individual and the legal system to represent his client as zealously as the bounds of ethics permit. *In Re Basso,* 112 U.S. App. D.C. 102, 299 F.2d 933 (1962). Canon 7, Paragraph 4 specifically says:

> "The advocate may urge any permissible construction of the law favorable to his client, without regard to his professional opinion as to the likelihood that the construction will ultimately prevail."

Paragraph 19 of the same Canon says:

> "Our legal system provides for the adjudication of disputes governed by the rules of substantive, evidentiary, and procedural law. An adversary presentation counters the natural human tendency to judge too swiftly in terms of the familiar that which is not yet fully known; the advocate, by his zealous preparation and presentation of facts and law, enables the tribunal to come to the hearing with an open and neutral mind and to render impartial judgments. The duty of a lawyer to his client and his duty to the legal system are the same: to represent his client zealously within the bounds of the law."

However, because of the peculiar nature of proceedings for involuntary hospitalization, it is not necessary that an individual's counsel be present at those stages of the proceedings where the individual is examined by physicians. *U.S. v. Albright,* 388 F.2d 719 (C.A. 4th Cir. 1968). The examination stage as provided by *Code,* 27-5-4, as amended, is best conducted according to the direction of the examining physician and the presence of counsel, unless specifically invited by the physician, would be unduly burdensome to an objective evaluation of the individual's mental condition. In an adversary proceeding, the individual is entitled to introduce evidence from his own expert witnesses. To recognize the same rights against self-incrimination which would be required in a criminal proceeding would make almost any commitment impossible, and would make the procedures so burdensome that medical conclusions obtained through

examination under Chapter 27, Article 5, Sections 2 and 3 of the *Code of West Virginia,* 1931, as amended, (emergency procedures) would be inadmissible. While complete justification for any deviation from normal civil and criminal due process standards must be demanded, it is unreasonable to hold that the State can never act in the best interest of an individual. There is justification for deviation in the case of emergency procedures where an individual's life may be in jeopardy. See, *In Re Willis,* 157 W.Va. 225, 202 S.E.2d 109 (December 11, 1973). It would do a great disservice to individuals to make the procedural requirements so cumbersome that suicidal or maniacal individuals could never be hospitalized until they had injured themselves or others.

## VI

In the case at bar, the petitioner alleges the invalidity of his commitment on the grounds that *Code,* 27-5-4, as amended, does not provide for proof beyond a reasonable doubt. This Court holds that in an involuntary commitment proceeding, proof need not be beyond a reasonable doubt because of the inexactitude of medical science; however, the proof must be clear, cogent, and convincing. In this regard we disapprove the holding of *Schutte v. Schutte, supra,* and supporting cases which require proof beyond a reasonable doubt. At this level of medical knowledge there may be many urgent cases in which it is impossible to exclude every reasonable doubt, and it appears that the likelihood of harm to individuals and society because of a standard of proof which makes commitment almost impossible greatly outweighs the likelihood of harm to the individual attributable to a less restrictive standard. Proof that is clear, cogent, and convincing is the highest standard of proof possible at the current state of the medical arts.

## VII

Finally petitioner challenges both commitment orders upon the grounds that verbatim transcripts of the proceedings were not kept, which he maintains violated his

right to review by the circuit court as provided in Chapter 27, Article 5, Section 5 of the *Code of West Virginia,* 1931, as amended. *Code,* 27-5-5, as amended, says:

> "Any person adversely affected by any order of commitment entered by the mental hygiene commission under this article may seek review thereof by appeal to the appropriate circuit court, and jurisdiction is hereby conferred upon such court to hear and entertain such appeals upon application made therefor in the manner and within the time provided by law for civil appeals generally."

We agree with petitioner that when the legislature established a mechanism for review of involuntary commitments, the legislature obviously intended a meaningful review, as otherwise *Code,* 27-5-5, as amended, would be anullity. A meaningful review is mandated under Article III, Section 10 of the *Constitution of West Virginia.* Therefore, the Court holds that in any proceeding before the mental hygiene commission of a county, it is necessary that a verbatim transcript of the proceedings be kept, and that all exhibits and other evidence be available for incorporation in a record to provide appropriate appellate review.

In the case at hand it is the judgment of this Court that a writ of *habeas corpus* issue discharging the petitioner from custody and restoring him to his full civil rights. However, in light of the broad changes in the administration of the mental health laws of this State which this opinion mandates, and as the statutes already provide a remedy for persons who are illegally committed, the Court holds that involuntarily hospitalized individuals who shall seek discharge from custody upon grounds of denial of due process similar to this case, must first seek review of their commitment pursuant to Chapter 27, Article 5, Section 5 of the *Code of West Virginia,* 1931, as amended, before applying to a court of record for a writ of *habeas corpus. Code,* 27-5-5, as amended, specifically provides:

"Any person hospitalized pursuant to section four [§ 27-5-4] of this article shall be entitled to have his case reviewed by the mental hygiene commission which committed him. Such review shall be obtained by a petition filed therein by such person or by that of his spouse, relative, guardian or friend. Upon receipt of any such petition, the commission shall conduct or cause to be conducted proceedings as specified in said section four: Provided, that no such re-examination shall be had if the petition is filed sooner than six months after entry of the order of hospitalization or sooner than one year after the filing of a previous petition of re-examination in accordance with the provisions of this action."

Under the provisions of Code, 27-5-5, as amended, an involuntarily hospitalized individual is entitled to a full hearing to test his capacity at least once every year. All future hearings brought pursuant to Code, 27-5-5, as amended, must be conducted under the standards established by this opinion.

The legislature has deemed it advisable to make the mental hygiene commission the forum for the adjudication of mental competence. As our interpretation of Code, 27-5-4, as amended, has radically changed the administration of the law, the Court holds that in the interest of the public safety the mental hygiene commission should have an opportunity to correct any procedural irregularities in the first instance. Therefore, before a writ of habeas corpus will lie on the constitutional grounds of failure of due process which became evident as a result of the holding of this case, it shall be necessary for a petitioner to demonstrate that he has made application for a new hearing before the mental hygiene commission of the county from which he was committed, and that one or more of the following occurred: (1) such petition has been denied; (2) the procedures employed at such hearing were violative of the rules set forth in this opinion or of other due process requirements; or, (3) the petition has not been acted upon within a reasonable time. As any hearings before the commissions which

failed to accord individuals their procedural rights are voidable, the mental hygiene commissions may immediately review the hospitalization of any inmate without regard to the time limitations denying such review in less than six months after the entry of an order of hospitalization or less than one year after the filing of a previous petition. In that way the hygiene commissions can avoid providing grounds for a writ of *habeas corpus,* because of failure to hear a petition within a reasonable time, and the legitimate interests of the individual as well as the State may be protected. Except in those specific instances in which the Court has ruled *Code,* 27-5-4, as amended, unconstitutional, the Court holds all other parts of *Code,* 27-5-4, as amended, are constitutional and severable, although under the facts of this case, the statute was unconstitutionally applied.

*Writ awarded.*