THOMAS J. HATCHER

*v.*

ANDREW WACHTEL,

*Acting Director, etc.*

(No. 14817)

Decided September 16, 1980.

*Barbara H. Fleisher* for petitioner.

*Chauncey H. Browning* Attorney General, *David R. Brisell*, Assistant Attorney General, for respondent.

HARSHBARGER, JUSTICE:

Thomas J. Hatcher is presently a patient at Spencer State Hospital to which he was involuntarily committed upon application by his mother, Marion Hatcher, per *W. Va. Code*, 27-5-4. After hearing, a mental hygiene commissioner found:

At this time I do find that he needs further care and treatment and I am going to commit him to Spencer State Hospital with the recommendation that he stay no longer than necessary and if possible he be allowed to attend Shawnee Hills for his treatment; but of course, that is going to be up to the hospital to make that determination as to how this is to be done. I assume Shawnee Hills and Spencer can work something out to help him. He will be released from confinement just as soon as they can get him adjusted to some kind of medication.

Hatcher's major contention is that the evidence did not prove, as required by *W. Va. Code*, 27-5-4(j)(1), that he was likely to cause harm to himself or others if allowed to remain at liberty.

The standard of proof applicable in an involuntary commitment proceeding was enunciated in *State ex rel. Hawks v. Lazaro*, 157 W.Va. 417, 202 S.E.2d 109 (1974), where we said that "proof need not be beyond a reasonable doubt because of the inexactitude of medical science; however, the proof must be clear, cogent, and convincing." [157 W. Va., at 444, 202 S.E.2d, at 126.]

This record indicates that there was sufficient evidence to prove clearly and convincingly that he was likely to be a danger to himself or others. At a probable cause hearing, his mother, Marion Hatcher, testified that relator had exhibited unusual conduct since the spring of 1979, thinking that his food was poisoned, that the laundry contained germs, and that roomers in her boarding house were FBI men. She also testified that he was afraid that she and neighbors were sprinkling his food with "angel dust"; and that he struck her in the back in December of 1979, precipitating her application for his involuntary commitment. Also, Mrs. Hatcher said that she was frightened of her son because he "screams at me. He yells at me. He says I am hypnotized. He wants to keep me in the back of the house and not let me go out."

A state witness, Donald Ashworth, Director of Substance Abuse at Shawnee Hills Mental Health Center, testified that relator suffered "paranoid thought patterns," and refused to take his medication as prescribed; but in his opinion was not dangerous to himself or others. The mental hygiene commissioner found probable cause that relator was likely to seriously harm himself or others if he remained free.

At a final hearing held January 16, 1980, Dr. Estella Primicias, who treated Hatcher at Spencer State Hospital, testified that she diagnosed Hatcher's illness as schizophrenia-paranoid type, and offered her opinion about whether he could be harmful to himself or others: "If he keeps on thinking that somebody might harm him, then there might be instances in which he will be completely convinced that somebody might try to harm him and he will try to protect himself. So he would be harmful in that way."

Shelia Emerson, a psychologist at Shawnee Hills and consultant at Spencer, agreed with Dr. Primicias that Hatcher "could become dangerous" if he thought someone was going to hurt him. Ms. Emerson typed him as "delusional," citing instances during which he carried his clothes and bed linens with him in the halls because someone wanted to put itching powder on them, and told her he feared someone in the hospital cafeteria was trying to poison him. She testified that when he was first placed in the crisis unit at the hospital during another proceeding, it was because he had threatened a doctor with a gun. She said he was not presently a danger to himself, but "[h]e has that potential."

Based upon this evidence, we conclude that the "clear, cogent and convincing" standard mandated in State ex rel. Hawks v. Lazaro, supra, was met. The commitment proceeding did not violate Hatcher's constitutional right to due process nor his statutory right under Code, 27-5-4(j)(1), to remain at liberty if the evidence did not show that he was likely to cause harm to himself or others.

Hatcher would have us interpret the statute to require that likelihood that one will cause harm to himself or others be imminent, and a substantial danger, citing *Suzuki v. Yuen*, 617 F.2d 173 (9th Cir. 1980). That court upheld a district court that struck down part of Hawaii's mental health law because it failed to require that a person be "imminently" dangerous to himself or others to be involuntarily committed to a mental health institution. The court held that it is unconstitutional to commit one who does not pose an imminent danger.

We prefer the reasoning by the Supreme Court of New Jersey in *State v. Krol*, 68 N.J. 236, 260-261, 344 A.2d 289, 302 (1975):

> Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future. Evaluation of the magnitude of the risk involves consideration both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place. ... It is not sufficient that the state establish a possibility that defendant might commit some dangerous acts at some time in the indefinite future. The risk of danger, a product of the likelihood of such conduct and the degree of harm which may ensue, must be substantial within the reasonably foreseeable future. On the other hand, certainty of prediction is not required and cannot reasonably be expected.

> A defendant may be dangerous in only certain types of situations or in connection with relationships with certain individuals. An evaluation of dangerousness in such cases must take into account the likelihood that defendant will be exposed to such situations or come into contact with such individuals.

> . . . .

> It should be emphasized that while courts in determining dangerousness should take full ad-

vantage of expert testimony presented by the State and by defendant, the decision is not one that can be left wholly to the technical expertise of the psychiatrists and psychologists. The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. This decision, while requiring the court to make use of the assistance which medical testimony may provide, is ultimately a legal one, not a medical one. [Citations omitted.]

Dr. Primicias testified that Hatcher could be dangerous if he came into contact with certain persons and believed they were trying to harm him. This precise situation existed in *State v. Krol, supra,* and the court said that an evaluation about whether a person is dangerous "must take into account the likelihood that defendant will be exposed to such situations or come into contact with such individuals." *See also, Cross v. Harris,* 418 F.2d 1095 (D.C. Cir. 1969); Livermore, Malmquist and Meehl, *On The Justifications for Civil Commitment,* 117 U. Pa. L. Rev. 75 (1968); Elkins, *Legal Representation of the Mentally Ill,* 82 W.Va. L. Rev. 157 (1979).

Hatcher's allegation about available less restrictive alternatives requires reference to *Markey v. Wachtel,* _____ W.Va. _____, 264 S.E.2d 437 (1979). We held that a good faith effort must be made to find a placement in a less restrictive alternative, and that *Code,* 27-5-4(j), places " '[t]he burden of proof of the lack of a less restrictive alternative ... on the person or persons seeking the commitment of the individual.' "

The state met this requirement. The possibility that Hatcher be committed to Shawnee Hills as an out-patient was mentioned, but no witness testified that this was a present viable alternative. He had refused his medication, and refused to cooperate with the Shawnee Hills staff when he had been there on previous occasions; each medical witness opined that Hatcher would

494

not benefit from treatment at Shawnee Hills. We are not aware of other alternatives and none were mentioned in the evidence.

The commissioner was correct in committing Hatcher to Spencer State Hospital.

*Writst denied.*