STATE *ex rel.* DONALD R. PIFER

*v.*

LARRY GALE PIFER

(No. 14896)

Decided December 9, 1980.

*Goodwin & Goodwin, Michael I. Spiker and Carrie L. Newton,* for appellant.

*Chauncey H. Browning,* Attorney General, *Thomas N. Trent,* Assistant Attorney General, for appellee.

PER CURIAM:

By order entered March 27, 1980, the Circuit Court of Jackson County, acting pursuant to the provisions of *W.Va. Code* 27-5-4 [1979], the Code section dealing with the involuntary commitment of the mentally ill, committed the appellant, Larry Gale Pifer, to Spencer State Hospital for an indefinite period not to exceed six months. The appellant now contends that the evidence adduced in his case did not clearly, cogently and convincingly prove that he presented a danger to himself or others and that his commitment was therefore improper. We agree, and we reverse the decision of the circuit court.

On February 25, 1980, Donald R. Pifer, the appellant's father, applied to the Circuit Court of Jackson County for the involuntary hospitalization of his son. His application was accompanied by a certificate prepared by Dr. Del Lahon, a licensed psychologist, stating that the appellant was mentally ill and that he should be hospitalized because he was likely to harm others. After conducting a probable cause hearing on the application, the Jackson County Mental Health Commissioner ordered that the appellant be temporarily committed to Spencer State Hospital for observation.

At the conclusion of the temporary hospitalization period, Andrew H. Wachtel, M.D., Chief Medical Officer of the hospital, filed an application with the circuit court for the appellant's final commitment. A final hearing was scheduled for March 24, 1980, and notices of that hearing were sent to the appellant, his wife, and parents.

At the March 24, 1980, hearing, the State adduced the testimony of four principal witnesses: Dr. Lenke M.

Rugonfalvy, a staff psychiatrist at Spencer State Hospital; Analiese Pifer, the appellant's wife; Donald R. Pifer, the appellant's father; and Anna Mae Pifer, the appellant's mother.

Dr. Rugonfalvy, who had observed the appellant at Spencer State Hospital on two occasions, concluded that the appellant was suffering from schizophrenia and that he was dangerous to himself. When asked why she had arrived at those conclusions, she noted that the appellant was undernourished, and she said:

> A. Because he doesn't have a job, doesn't want to work and is unable to, unable to take care of his personal needs; I mean make money and support himself.
>
> Q. So he's dangerous to himself because of that; is that your opinion?
>
> A. Because of this, yes, and because he thinks that people are against him and that is, he has to be a leader.

When questioned further, Dr. Rugonfalvy indicated that while the appellant was confined in Spencer State Hospital he had behaved in a cooperative manner and he had not presented a danger to himself or others.

The State's second principal witness was Analiese Pifer, the appellant's wife. At one point in the proceeding she gave the following testimony.

> Q. Now, I call your attention to the matters in this petition and ask you if you are concerned about your health, safety and welfare, do you as the wife of Larry Gale Pifer? Do you have concerns?
>
> A. No.
>
> Q. O. K. Do you have such concerns for the health, safety and welfare of your children, Kathy and your other child?
>
> A. I don't know.

Mrs. Pifer stated that the appellant objected to their daughter wearing glasses at home and that her daughter

was afraid that the appellant might throw the glasses away; she also indicated that she had never personally observed her husband mistreating either of the children. She considered him an adequate father, and she testified:

Q. Have you ever observed any behavior that's unusual or irrational that would lead you to be concerned about your health or your childrens' health, safety and welfare?

A. No.

She did, however, indicate that she had noticed changes in the appellant's behavior and that he did not want to talk about certain things. On rare occasions he had spanked the children, and he had quit his job without giving Mrs. Pifer an adequate explanation. Mrs. Pifer's testimony indicated that the appellant had not harmed her or her children, and had not threatened to harm them in the recent past.

Donald R. Pifer, the appellant's father, was the third principal witness for the State. Mr. Pifer indicated that his son had in three ways demonstrated bizarre behavior. On one occasion he had seen his son break glass objects (lightshades and a butter dish). When asked why he had broken the butter dish, the appellant had indicated that he was upset with the design in it. Mr. Pifer on another occasion had seen a small handmade calendar on the appellant's wall which indicated that the year was 203; the appellant had given no explanation for this calendar. As a third incident of bizarre behavior Mr. Pifer pointed to the fact that the appellant had removed screws from his trailer and cut them to pieces. Mr. Pifer also expressed concern over the fact that the appellant had lost weight and had stopped working. He indicated that the appellant had felt that the men on his job were ganging up on him. However, when questioned about the likelihood that the appellant would harm himself or others, Mr. Pifer testified:

Q. Have you ever seen your son do anything in your opinion would harm himself physically?

A. No.

Q. Has he ever done any actions that you would consider to be harmful to someone else, physically harm someone else?

A. Not that I've seen.

The fourth principal witness for the State was Anna Mae Pifer, the appellant's mother. Mrs. Pifer testified regarding the appellant's military service and also testified that on one occasion she had observed the appellant and his wife quarreling in the appellant's trailer. When she arrived in the trailer, the appellant broke two lightshades in the livingroom. He also broke a butter dish and removed Philip screws from the trailer. When asked why he had done those things, he explained that he didn't like the objects. Mrs. Pifer also observed the calendar for the year 203. She indicated that she had never questioned her son regarding this calendar. When asked what her son did during the day she indicated that he took walks on the farm and listened to music. She also testified as follows:

Q. Do you have an opinion as to whether you think Larry is a danger either to himself or to others?

A. I really don't know. I don't think he acts like Larry, if that's what you mean.

Q. Are you concerned about the safety and health and the welfare of Analiese or the two grandchildren?

A. I believe Anna can take care of herself. I don't know about the children.

Q. Why do you worry about the grandchildren?

A. Well, I worry about them right now, for instance, how he was in the hospital and the little girl was out running the road one day when it was real bad and it snowed and I was afraid to death about her afraid she would get hit with a car.

Q. Do you worry more about her when Larry's home or less?

A. No. Larry was always good to help watch the children.

To justify involuntary hospitalization of a person under the provisions of *W.Va. Code* 27-5-4 [1979], it must be shown that the individual is mentally ill, retarded or addicted and that because of his illness, retardation or addiction he is likely to cause serious harm to himself or to others if allowed to remain at liberty. *W.Va. Code* 27-5-4(j) [1979]; *State ex rel. Hawks v. Lazaro*, 157 W.Va. 417, 202 S.E.2d 109 (1974).

While it is not necessary that the likelihood of harm be imminent, it is necessary that there be a substantial risk of harmful conduct within the reasonably foreseeable future. *Hatcher v. Wachtel*, 165 W.Va. 489, 269 S.E.2d 849 (1980); *see, State ex rel. Hawks v. Lazaro, supra.*

The standard of proof required to support an involuntary commitment is set forth in Syllabus Point 7 of *State ex rel. Hawks v. Lazaro, supra*:

> The proper standard of proof in a proceeding for involuntary commitment pursuant to Chapter 27, Article 5, Section 4 of the Code of West Virginia, 1931, as amended, is proof which is clear, cogent and convincing.

In the case before us Dr. Rugonfalvy, the only professional person to assess the appellant's condition, concluded that the appellant was a risk to himself because he was unable or refused to earn a living, to make money, to provide for his own support. The testimony of the appellant's parents supported Dr. Rugonfalvy's observation that the appellant would not work, but did not indicate that the appellant was unable to care for himself or that he was likely to cause serious harm to himself.

Dr. Rugonfalvy indicated that the appellant had been cooperative at Spencer State Hospital, and that he had not presented a danger to others. The appellant's wife indicated that she had observed nothing in behavior which would lead her to be concerned about the health, safety, or welfare of herself or her children. The appellant's mother indicated that she was less worried about her grandchildren when the appellant was at home than when he was away. Although the appellant's father indicated concern

about glass on the floor of the appellant's trailer, he testified that he had never seen his son do anything harmful to himself or anyone else.

While the evidence in this case regarding the appellant's bizarre behavior toward certain objects might support a finding of mental illness, it does not clearly, cogently, and convincingly show that the appellant is likely to cause serious harm to himself or others within the reasonably foreseeable future.

It is, therefore, ordered that the judgment of the Circuit Court of Jackson County be reversed.

*Reversed.*