Sharon SUZUKI, on behalf of herself and all other persons similarly situated, Plaintiffs,

and

Rosita T. Alba and Jane Doe, Plaintiffs-Intervenors,

v.

Walter QUISENBERRY, Individually and in his capacity as Director of Health, State of Hawaii, et al., Defendants.

Civ. No. 73–3854.

United States District Court, D. Hawaii.

Feb. 24, 1976.

1114

Peter A. Lee, Jonathan B. Steiner, John Harris Paer, Legal Aid Society of Hawaii, David S. Hobler, Paul, Margolis, Warner & Johnson, Honolulu, Hawaii, for plaintiffs and plaintiffs-intervenors.

Gerald Y. Y. Chang, Michael R. Marsh, Deputy Attys. Gen., Ronald Y. Amemiya, Atty. Gen. of Hawaii, Robert E. St. Sure, Deputy Corp. Counsel, Barry Chung, Corp. Counsel, City and County of Honolulu, John H. R. Plews, Anthony, Hoddick, Reinwald & O'Connor, Honolulu, Hawaii, for defendants.

## DECISION ON MOTION FOR SUMMARY JUDGMENT

SAMUEL P. KING, Chief Judge.

### SYNOPSIS

With almost unanimous approval, the Fourth State Legislature of the State of Hawaii passed a new law relating to "Mental Health, Mental Illness, Drug Addiction and Alcoholism." Act 259, Session Laws of 1967, effective January

1, 1968, adopted the "medical model" and repealed the "legal model" in dealing with persons who behave differently than their peers because of some mental disorder or because of the intake of drugs or alcohol. It was hailed as a progressive and liberal piece of legislation.[1]

A scant six years later, attorneys from the Legal Aid Society of Hawaii, the Office of the Public Defender, and the American Civil Liberties Union of Hawaii, representing persons subject to the operation of this law, filed this action attacking Act 259 as unconstitutional.

While mistreatment of some patients is alleged, the impetus for this attack is probably more properly ascribed to a growing disillusionment with the "medical model" in all fields of behavioral control of human beings, the impact of recent decisions of federal courts, and the ongoing skepticism of civil libertarians with all forms of enforced assistance.[2]

Upon careful review of Act 259 in the light of the arguments made by counsel for the plaintiffs, I am convinced that they are right and that the nonconsensual[3] features of the act are unconstitutional, except for a limited application of the short-term emergency hospitalization section.

## STATEMENT OF THE CASE

An Application for Writ of Habeas Corpus and Complaint was filed herein on June 15, 1973, seeking release of Plaintiff Suzuki from Queen's Medical Center Psychiatric Facility, a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that certain provisions (H.R.S. §§ 334–53, 334–54, and 334–81) of Hawaii's mental health statute (H.R.S. Chap. 334) are unconstitutional, and an injunction pursuant to 42 U.S.C. § 1983 against the use of the nonconsensual provisions of the statute. The suggestion was made that a three-judge district court be convened if required.[4]

Rosita T. Alba was allowed to intervene as a plaintiff by order entered July 18, 1973. In her Motion to Intervene, she complained of the same provisions of Hawaii's mental health statute (H.R.S. §§ 334–53, 334–54, and 334–81), alleged a violation of her civil rights, and asked for damages pursuant to 42 U.S.C. § 1983. Her complaint in intervention paralleled Plaintiff Suzuki's complaint and dropped the claim for damages.

Jane Doe, a real person who wishes to remain anonymous on the public record, was allowed to intervene as a plaintiff by order entered October 15, 1973. Her complaint in intervention paralleled Plaintiff Suzuki's complaint.

Plaintiff Suzuki's application for writ of habeas corpus became moot when she was released from the Queen's Medical Center Psychiatric Facility before June 20, 1973, the return day on the order to show cause why the writ should not issue. Intervenors Rosita T. Alba and Jane Doe were not being restrained of their liberty at the time of their motions to intervene.

---

1. See King, *Thou Shalt Not Commit*, 5 H.B.J. 46 (1968), republished as *The Role of the Court in Treatment of the Addicted or Mentally Ill*, 52 Judicature 71 (1969).

2. See Stone, *Mental Health and the Law*, 27 Harv.L.S.Bull. No. 2, 28.

3. Although the type of commitment of which plaintiffs complain has commonly been referred to as "involuntary civil commitment," this court prefers the term "nonconsensual civil commitment" as more accurately describing the procedure actually followed. The word "involuntary" imports that the individual concerned has made a conscious choice against confinement in a psychiatric facility. More often than not, the person "certified" as "mentally ill to an extent requiring hospitalization" is in no condition to make any rational decision.

4. Defendant Director of Health argues that a three-judge court is required by 28 U.S.C. §§ 2281 and 2284. Inasmuch as I conclude that there is no longer any substantial question as to the constitutional principles applicable to Hawaii's mental health law, a three-judge court is not mandated. See *Bailey v. Patterson*, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

Jurisdiction of this court lies under 28 U.S.C. § 1343.

The defendants are Walter Quisenberry, individually and in his capacity as Director of Health, State of Hawaii; Francis Keala, individually and in his capacity as Chief of the Honolulu Police Department; and George Bolian, M.D., Director of Psychiatric Services, Queen's Medical Center.

After a certain amount of discovery by way of interrogatories, the case lay dormant for some six months. On May 6, 1975, Plaintiff Suzuki and Plaintiff-Intervenor Jane Doe filed a Motion for Summary Judgment, relying principally on *Lessard v. Schmidt*, 379 F.Supp. 1376 (E.D.Wis.1974) (three-judge court). While there is no formal pleading by which Plaintiff-Intervenor Alba joins in this motion, she did on May 27, 1975, change attorneys so as to wind up with the same attorneys as the other plaintiffs.

Issue was joined on the Motion for Summary Judgment and argument thereon was held on June 26, 1975. Further memoranda were filed on July 11, 1975, and October 29, 1975.

An order certifying class was entered on July 2, 1975, whereby it was ordered that the action be maintained as a class action pursuant to Rule 23(b)(2), the class to consist of:

All persons who are now or who may be in the future admitted [to] and detained at a psychiatric facility (*See* H.R.S. § 334–1) as a patient

(a) under H.R.S. §§ 334–51(a)(2), 334–53, 334–71, and [or] 334–73(b) [hereinafter Subclass A], or

(b) under H.R.S. §§ 334–51(a)(3), 334–54, or 334–73(a) [hereinafter Subclass B].

Notice to members of the class was postponed pending decision on the Motion for Summary Judgment.

There are no genuine issues as to any material facts. The applicable law is no longer subject to doubt.

## UNDISPUTED FACTS

### H.R.S. § 334.

Hawaii's mental health statute provides for the admission to and detention at a psychiatric facility of certain persons under certain conditions. These authorizations are summarized in H.R.S. § 334–51.

The operative provisions of law are H.R.S. § 334–53 and H.R.S. § 334–54. In brief, H.R.S. § 334–54 authorizes the detention of a person for a period not to exceed 48 hours on the certificate of one physician, and H.R.S. § 334–53 authorizes the detention of a person for an indefinite period of time on the certificates of two physicians.

The place of detention must be a "psychiatric facility" licensed by the state department of health.

Physicians permitted to execute the required certificates include any physician and surgeon licensed by the state to practice medicine.

### H.R.S. § 334–54.

Persons subject to the provisions of H.R.S. § 334–54 include "any person whose condition or actions are such that it is necessary that he receive an immediate examination or immediate care and treatment at a psychiatric facility." The certificate of one physician is sufficient, without any accompanying application or other formality. Nevertheless, since many emergency situations arise in the course of police work, the section provides that "[A]ny police officer may take into custody and transport to any facility designated by the director of health, any person apparently mentally ill and conducting himself in a manner which in a mentally well person would be disorderly, or any person apparently intoxicated and found under circumstances in which he would be subject to arrest or in which his safety or property or the safety or property of others is endangered because of his actions or condition, and make application for the examination, observation, diagnosis, and, if appropriate, certification of the person." Acceptance of

the person as a patient by the psychiatric facility terminates the responsibility of the police officer for the person taken into custody, but does not affect the liability of such person to subsequent arrest and prosecution for violation of any penal law.

Admissions pursuant to H.R.S. § 334–54 are "for examination, observation, care, and treatment as a patient . . for a period not to exceed forty-eight hours . . ." Emergency admittees must be examined as soon as practicable at the facility by a licensed physician who practices in the specialty of psychiatry, other than the certifying physician. If this examining psychiatrist fails to certify that continued hospital treatment is necessary, the admittee must be discharged forthwith.

*H.R.S. § 334–53.*

Persons subject to the provisions of H.R.S. § 334–53 include "any person mentally ill or habituated to the excessive use of drugs or alcohol, to an extent requiring hospitalization." A mentally ill person is defined as "a person having psychiatric disorder or other disease which substantially impairs his mental health." A person habituated to the excessive use of drugs or alcohol is defined as "a person who repeatedly and compulsively uses narcotic, stimulant, depressant, or hallucinogenic drugs or alcohol to an extent which interferes with his personal, social, family, or economic life." The certificates of two physicians accompanied by an application made by either of the certifying physicians, or by the spouse or guardian or any relative or friend, of the admittee, or by any responsible person, is sufficient, without any other formality.

Admissions pursuant to H.R.S. § 334–53 are "for observation, care, and treatment as a patient . . . as long as hospitalization is needed . . ."

Written notice of the application for admission must be given to the patient upon admission. The notice shall set forth the patient's rights under the law. A copy of the application must be delivered or mailed to the spouse, relative, or friend identified in the application, or, if none, to the family court.

*Use of force.*

Both H.R.S. § 334–53 and H.R.S. § 334–54 provide for the use of force to get or to return a "patient" to the psychiatric facility and to keep him there.

*H.R.S. §§ 334–71 and 334–73.*

H.R.S. § 334–71 allows transfer of patients from one psychiatric facility to another without recertification. The only requirement is that the sending facility "make reasonable efforts to notify the spouse, parents, legal guardian, or other nearest known relative or friend of the patient, or if there is no such person readily available the family court of the circuit in which the receiving facility is located, that a transfer has been made."

H.R.S. § 334–73 allows out-of-state lawfully hospitalized patients of out-of-state mental hospitals to be hospitalized when found in or transferred to Hawaii, for either emergency treatment pursuant to H.R.S. § 334–54 or long-term treatment pursuant to H.R.S. § 334–53, but without recertification locally.

*H.R.S. § 334–81.*

Although there is no prior judicial examination into the basis for the nonconsensual hospitalization effected pursuant to H.R.S. § 334–54 or H.R.S. § 334–53, there is provision under H.R.S. § 334–81 for a post-admission judicial determination of the regularity of an admission or of the need for continued hospitalization. The section applies only to admissions pursuant to H.R.S. § 334–53 or H.R.S. § 334–71. (Hospitalization pursuant to H.R.S. § 334–54 cannot last longer than 48 hours, which is a shorter period than it would take for the usual hearing. In any event, the writ of habeas corpus is still available.)

This judicial determination is structured around an order to show cause why the patient should not be discharged forthwith. The show cause order issues without cost, on forms provided by the

court, at the request of the patient, any member of his family, relative, friend, or responsible person. The psychiatric facility is required to assist the patient to forward the request to the court if the patient objects to his admission or continued hospitalization. The determination is made by the court without a jury, based on a preponderance of the evidence. A judicial determination under this procedure may not be demanded as of right more often that once in a period of six months.

*H.R.S. § 334–76.*

If not released by order of a court, a patient detained pursuant to H.R.S. § 334–53 (and also H.R.S. § 334–71 and H.R.S. § 334–73) may be kept in a psychiatric facility until discharged by the administrator of the psychiatric facility or his deputy or the physician assuming medical responsibility for the patient as provided by H.R.S. § 334–76, which discharge

(1) shall be effected when, in the judgment of the administrator, deputy, or physician, the patient is no longer mentally ill or habituated to the excessive use of drugs or alcohol; and

(2) may be effected when, in the judgment of the administrator, deputy, or physician (A) the patient has received maximum benefit from hospitalization, and (B) the patient's discharge will not be detrimental to the public welfare or injurious to himself.

*Plaintiff SUZUKI.*

Plaintiff Sharon Suzuki was picked up by a police officer at the intersection of Kalakaua Avenue and Lewers Road in Waikiki and taken to the Psychiatric Facility at the Queen's Medical Center in Honolulu, Hawaii, on May 23, 1973. Upon arrival at the center, she was examined by a physician, who certified that she required hospitalization for a period up to 48 hours. Subsequent thereto, plaintiff was examined by two physicians, who certified that she required further hospitalization.

Plaintiff objected to her hospitalization and retained counsel through the Legal Aid Society of Hawaii to effect her release. On June 15, 1973, plaintiff's attorney filed the present action. Plaintiff was discharged from the center on June 18, 1973.

*Plaintiff ALBA.*

Intervening plaintiff Rosita T. Alba was picked up by a police officer at her home on April 26, 1973, and taken to the Psychiatric Facility at the Queen's Medical Center in Honolulu, Hawaii, pursuant to a request to the police department for such action by her mother, with whom plaintiff-intervenor lived. She was released by attendants at the center shortly after arrival. Upon her return home, plaintiff-intervenor's mother once again called the police department seeking assistance in hospitalizing her daughter. Plaintiff-intervenor was then handcuffed by policemen and taken once more to the Psychiatric Facility at the Queen's Medical Center. This time, she was examined by a physician and admitted without her consent. She was then examined by a second doctor, who discussed with her the reasons for the confinement. She requested a court hearing and appointment of counsel. The prescribed forms were given to her; they were completed on April 28, 1973, and filed with the family court on April 30, 1973. She was released by the center on May 1, 1973.

*Plaintiff DOE.*

Intervening plaintiff Jane Doe is a 29-year old woman residing in Honolulu, Hawaii. She wished to remain anonymous to avoid public embarrassment or ridicule, but her identity at all times has been made available to the court. She was delivered by an ambulance service and committed without her consent at the State Hospital for the mentally ill at Kaneohe, Hawaii, on March 30, 1973. She claims that she was told at the hospital that she would be confined for only two days. She was placed on leave status on May 4, 1973, and discharged on May 21, 1973.

## THE POWER TO COMMIT

In *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the Supreme Court discussed the limits of the power of a state to confine a person for mental illness. The trial court had found that Donaldson was neither dangerous to himself nor dangerous to others, and also had found that, if mentally ill, he had not received treatment. The Supreme Court held that he had been deprived of his constitutional right to liberty. The Court said:

A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

. . . [T]he mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends.

. . .

. . . Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. . . .

In short, a State cannot constitutionally confine without more a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. Since the jury found, upon ample evidence, that O'Connor, as an agent of the State, knowingly did so confine Donaldson, it properly concluded that O'Connor violated Donaldson's constitutional right to freedom. *Id.* at 575–576, 95 S.Ct. at 2493, 45 L.Ed.2d at 406.

On what basis, then, may a state confine persons alleged to be mentally ill?

The Court avoided this question, saying:

We have concluded that the difficult issues of constitutional law dealt with by the Court of Appeals are not presented by this case in its present posture. Specifically, there is no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State, or whether the State may compulsorily confine a nondangerous, mentally ill individual for the purpose of treatment. As we view it, this case raises a single, relatively simple, but nonetheless important question concerning every man's constitutional right to liberty.

. . . We need not decide whether, when, or by what procedures, a mentally ill person may be confined by the State on any of the grounds which, under contemporary statutes, are generally advanced to justify involuntary confinement of such a person—to prevent injury to the public, to ensure his own survival or safety, or to alleviate or cure his illness. . . For the jury found that none of the above grounds for continued confinement was present in Donaldson's case.

. . . The fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for the confinement. . . . Nor is it enough that Donaldson's original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed. . . . *Id.* at 573–575, 95 S.Ct. at 2492, 45 L.Ed.2d at 405.

Chief Justice Burger felt called upon to throw some light on the problem, saying in part in a concurring opinion:

There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law. . . . Commitment must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist. . . .

. . . [T]he idea that States may not confine the mentally ill except for the purpose of providing them with treatment is of very recent origin, and there is no historical basis for imposing such a limitation on state power. . . . There can be little doubt that in the exercise of its police power a State may confine individuals solely to protect society from the dangers of significant antisocial acts or communicable disease. . . . Additionally, the States are vested with the historic *parens patriae* power, including the duty to protect "persons under legal disabilities to act for themselves."

. . .

Of course, an inevitable consequence of exercising the *parens patriae* power is that the ward's personal freedom will be substantially restrained . . .. Thus, however the power is implemented, due process requires that it not be invoked indiscriminately. At a minimum, a particular scheme for protection of the mentally ill must rest upon a legislative determination that it is compatible with the best interests of the affected class and that its members are unable to act for themselves. . . . Moreover, the use of alternative forms of protection may be motivated by different considerations, and the justifications for one may not be invoked to rationalize another. . .

However, the existence of some due process limitations on the *parens patriae* power does not justify the further conclusion that it may be exercised to confine a mentally ill person only if the purpose of the confinement is treatment. . . . It may be that some persons . . . are unable to function in society and will suffer real harm to themselves unless provided with care in a sheltered environment. . . . At the very least, I am not able to say that a state legislature is powerless to make that kind of judgment. . . .

Alternatively, it has been argued that a Fourteenth Amendment right to treatment for involuntarily confined mental patients derives from the fact that many of the safeguards of the criminal process are not present in civil commitment. . . . To the extent that this theory may be read to permit a State to confine an individual simply because it is willing to provide treatment, regardless of the subject's ability to function in society, it raises the gravest of constitutional problems . . . .

It is too well established to require extended discussion that due process is not an inflexible concept. Rather, its requirements are determined in particular instances by identifying and accommodating the interests of the individual and society. . . . Where claims that the State is acting in the best interests of an individual are said to justify reduced procedural and substantive safeguards, this Court's decisions require that they be "candidly appraised." . . .

A . . . troublesome feature of the *quid pro quo* theory is that it would elevate a concern for essentially procedural safeguards into a new substantive constitutional right. Rather than inquiring whether strict standards of proof or periodic redetermination of a patient's condition are required in civil confinement, the theory

accepts the absence of such safeguards but insists that the State provide benefits which, in the view of a court, are adequate "compensation" for confinement. In light of the wide divergence of medical opinion regarding the diagnosis of and proper therapy for mental abnormalities, that prospect is especially troubling in this area and cannot be squared with the principle that "courts may not substitute for the judgments of legislators their own understanding of the public welfare, but must instead concern themselves with the validity under the Constitution of the methods which the legislature has selected." . . .

In sum, I cannot accept the reasoning of the Court of Appeals and can discern no basis for equating an involuntary committed mental patient's unquestioned constitutional right not to be confined without due process of law with a constitutional right to treatment. Given the present state of medical knowledge regarding abnormal human behavior and its treatment, few things would be more fraught with peril than to irrevocably condition a State's power to protect the mentally ill upon the providing of "such treatment as will give [them] a realistic opportunity to be cured." Nor can I accept the theory that a State may lawfully confine an individual thought to need treatment and justify that deprivation of liberty solely by providing some treatment. Our concepts of due process would not tolerate such a "trade-off." . . . *Id.* at 580–589, 95 S.Ct. at 2496, 45 L.Ed.2d at 410.

Some guidance is provided by earlier cases. In *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394, 402 (1972), Justice Marshall mentions in a favorable context that Wisconsin conditions confinement for compulsory psychiatric treatment "not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty."[5] The actual language of the Wisconsin statute is not so explicit. The act refers to a person who is mentally ill and "a proper subject for custody and treatment," where mental illness is defined as "mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community."

*Lessard v. Schmidt*, 349 F.Supp. 1078, 1093 (E.D.Wis.1972) (three-judge court), accepted Justice Marshall's interpretation of Wisconsin's statute and went on to say:

> . . . The Court did not directly address itself to the degree of dangerousness that is constitutionally required before a person may be involuntarily deprived of liberty. However, its approval of a requirement that the potential for doing harm be *"great enough* to justify such a *massive curtailment* of liberty" implies a balancing test in which the state must bear the burden of proving that there is an extreme likelihood that if the person is not confined he will do immediate harm to himself or others. Although

---

5. Justice Marshall apparently considered the right to a jury trial as an important aspect of the definitional process as "the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment."

In *Jackson v. Indiana*, 406 U.S. 715, 728, 92 S.Ct. 1845, 1853, 32 L.Ed.2d 435, 445 (1972), Justice Blackmun saw a possible requirement for a finding of "dangerousness" in Indiana's definition of a mentally ill person as one who "is afflicted with a psychiatric disorder which

substantially impairs his mental health; and, because of such psychiatric disorder, requires care, treatment, training or detention in the interest of the welfare of such person or the welfare of others of the community in which such person resides." Indiana did not provide a jury trial on the issue of mental illness.

In Bell v. Wayne County General Hospital at Eloise, 384 F.Supp. 1085 (E.D.Mich.1974) (three-judge court), the court was unable to find any implication of a "dangerousness" requirement in Michigan's commitment process. Jury trial on the question of mental illness was available on demand.

attempts to predict future conduct are always difficult, and confinement based upon such a prediction must always be viewed with suspicion, we believe civil confinement can be justified in some cases if the proper burden of proof is satisfied and dangerousness is based upon a finding of a recent overt act, attempt or threat to do substantial harm to oneself or another.

Even this standard is qualified by footnote in the case of attempts to substantially harm oneself. In such cases, the court thought there should be a showing of immediate danger at the time of the hearing of further attempts at self injury.

*Lynch v. Baxley*, 386 F.Supp. 378, 389–392 (M.D.Ala.1974) (three-judge court), discusses the matter of dangerousness at some length, beginning with a pronouncement by the Supreme Judicial Court of Massachusetts in 1845. The court notes the difference between commitment on account of dangerousness to others which derives from the state's police power, and commitment on account of dangerousness to self which derives from the state's function as *parens patriae*, and explains:

> A finding of dangerousness indicates the likelihood that the person to be committed will inflict serious harm on himself or on others. In the case of dangerousness to others, this threat of harm comprehends the positive infliction of injury—ordinarily physical injury, but possibly emotional injury as well. In the case of dangerousness to self, both the threat of physical injury and discernible physical neglect may warrant a finding of dangerousness. Although he does not threaten actual violence to himself, a person may be properly committable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or

refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable.

The Court concluded that every order of commitment must be supported by findings that:

(a) The person to be committed is mentally ill.

(b) The person to be committed poses a real and present threat of substantial harm to himself or to others.

(c) The danger posed by the person to be committed has been evidenced by a recent overt act.

(d) There is treatment available for the illness diagnosed; or that there is no known cure or treatment for the illness but confinement is nevertheless necessary for the safety and well-being of the community and of the person to be committed[6] and treatment shall be provided when available.

By the time *Bell v. Wayne County General Hospital at Eloise*, 384 F.Supp. 1085 (E.D.Mich.1974) (three-judge court) was decided, the requirement of "dangerousness" was accepted without argument.

> The basic postulate of these challenges is that a state may not deprive a person of liberty on grounds of mental illness unless, because of such mental illness, he presents a danger to himself or to others. Defendants do not contest this principle.

■ Since H.R.S. § 334–53 purports to authorize nonconsensual hospitalization of any person solely because that person may be "mentally ill or habituated to the excessive use of drugs or alcohol, to an extent requiring hospitalization," that provision of law is unconstitutional on its

---

**6.** *Quaere* whether in this situation the "well-being . . . of the person to be committed" must be considered. *See O'Connor v. Donaldson, supra,* 422 U.S. at 582–583, 95 S.Ct. at 2497, 45 L.Ed.2d at 411, where Chief Justice Burger says: "There can be little doubt that in the exercise of its police power a State may confine individuals solely to protect society from the dangers of significant antisocial acts or communicable disease."

face.[7] This conclusion necessarily applies also to the conversion of an emergency commitment to a long-term commitment pursuant to H.R.S. § 334–54, to the transfer of patients between hospitals pursuant to H.R.S. § 334–71 or from out-of-state pursuant to H.R.S. § 334–73(b), and to the authorization set out in H.R.S. § 334–51(a)(2) and (5).

## EMERGENCY DETENTION

The emergency detention provisions of H.R.S. § 334–54 are significantly different from the long-term commitment provisions of H.R.S. § 334–53.

Something more than mental illness or substance abuse is required to trigger the use of H.R.S. § 334–54. The statute refers to "condition or actions" which are "such that it is necessary" that the person receive an immediate examination or immediate care and treatment at a psychiatric facility.

When a police officer is involved, he must find the apparently mentally ill person "conducting himself in a manner which in a mentally well person would be disorderly"[8] or the apparently intoxicated person "under circumstances in which he would be subject to arrest or in which his safety or property or the safety or property of others is endangered because of his actions or condition."

■ Clearly the purpose of the additional language is to provide an alternative to the arrest and jailing of a person who is behaving in a manner that might be deemed to be in violation of a criminal law, or that might endanger that person's safety, where the arresting officer believes that mental illness or intoxication might be a cause of the behavior.

■ While certain language in the section, standing alone, might seem to encompass more situations than those in which a person is engaged in criminal behavior or poses an immediate danger to himself or to others, a reading of the section as a whole and in the context of the entire statute makes it clear that the section was intended to be so limited.

Emergency detention situations evoke different constitutional considerations.

In *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972)[9] (three-judge court), while holding that Wisconsin's statutes for the involuntary commitment of persons alleged to be mentally ill were unconstitutional in most respects, the court nevertheless said:

It can be argued that no deprivation of liberty is permissible under the due process clause without a prior hearing. We think, however, that the state may sometimes have a compelling interest in emergency detention of persons who threaten violence to themselves or others for the purpose of protecting society and the individual. . . . Such an emergency measure can be justified only for the length of time necessary to arrange for a hearing before a neu-

---

**7.** I do not find any implication of a "dangerousness" requirement in the commitment process pursuant to H.R.S. § 334–53.

**8.** In 1967, "disorderly conduct" (H.R.S. § 772–2) was a misdemeanor (H.R.S. § 772–3), and "vagrancy" (H.R.S. § 772–1) and "loitering" (H.R.S. § 772–5) were petty offenses.

**9.** This case has had a complicated history. The cited decision was appealed to Supreme Court, which vacated the order below and remanded the case for further proceedings because of a failure to satisfy the requirements of Rule 65(d), Fed.R.Civ.P., *Schmidt v. Lessard,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). The lower court complied with the Supreme Court's order. *Lessard v.*

*Schmidt,* 379 F.Supp. 1376 (E.D.Wis.1974). On appeal again the Supreme Court vacated the lower court's judgment and remanded the case "for further consideration in light of *Huffman v. Pursue, Ltd.,* . . . ." *Schmidt v. Lessard,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), applied the principles of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), to a state civil proceeding for the closure of a theater for one year for exhibiting obscene films. Here, there are no state proceedings ongoing or threatened, and plaintiffs are not seeking to relitigate a federal issue adversely determined in completed state court proceedings.

tral judge at which probable cause for the detention must be established.

. . . we believe that the maximum period which a person may be detained without a preliminary hearing is 48 hours. . . .[10] *Id.* at 1091.

In *Bell v. Wayne County General Hospital at Eloise*, 384 F.Supp. 1085 (E.D. Mich.1974) (three-judge court), while holding that Michigan's statutes for the involuntary civil commitment and treatment of persons alleged to be mentally ill were unconstitutional in several respects, the court nevertheless noted in its order for partial summary judgment:

Nothing in this order shall be construed as a finding or a declaration that it is unconstitutional to involuntarily treat a person who has not been finally adjudicated as mentally ill, but who in the professional judgment of a physician appears to be in immediate need of treatment in order to prevent him from physically harming himself or others, provided such treatment is necessary to maintain physical health.[11] *Id.* at 1102.

In *Lynch v. Baxley*, 386 F.Supp. 378 (Md.Ala.1974) (three-judge court), while holding that Alabama's statutes for the involuntary commitment of persons alleged to be mentally ill were unconstitutional, the court cited *Lessard v. Schmidt, supra*, for the proposition that emergency detention without a hearing could be justified only for the length of time required to arrange a probable cause hearing before a judicial officer.

The court set 7 days as the maximum time for emergency detention in the absence of a probable cause hearing, and 30 days from detention as the maximum time within which to hold a full hearing on the need for commitment.

■ In the light of these authorities, H.R.S. § 334–54 and the authorization set out in H.R.S. § 334–51(a)(3), as construed and applied, do not violate the federal constitution.

It may be argued that emergency detention in the context of the mental health laws is only permissible as a prelude to a further detention after notice and hearing, and that inasmuch as H.R.S. § 334–53 is unconstitutional, H.R.S. § 334–54 must also be inoperative. *Lessard v. Schmidt* and *Lynch v. Baxley*, as quoted above, seem to require this result. The more careful language of *Bell v. Wayne County General Hospital at Eloise*, quoted above, leaves room for other dispositions of the person detained.

■ In my opinion, a full hearing as to whether a person should be detained and treated for mental illness is not a necessary consequence of emergency detention. The patient may be released without further action, or may agree to be a voluntary patient for a longer period of time, or may be turned over to the police for processing in the criminal justice system. Whatever the disposition, the state's interest in emergency intervention is the same and is sufficient to justify the temporary deprivation of liberty without prior notice or hearing.

■ These same considerations do not apply to H.R.S. § 334–73(a), which pur-

---

**10.** The court suggested a preliminary "probable cause" hearing within 48 hours of an emergency detention, followed by a full hearing from 10 to 14 days after detention.

**11.** This referred to immediate apprehension and detention for periods of either 5 days or 48 hours, applying standards which require the presence of an element of danger to self or to others. The 5-day limit applied in cases of judicially authorized detention, where it appeared to a judge that confinement was neces-

sary and essential to public safety, and also in cases where detention was authorized by a government physician who found immediate detention was necessary for public safety or the safety of the individual. In all such cases the 5-day limit could be extended by order of a judge. The 48-hour limit applied where, on his own initiative, a police officer confined a person believed to be mentally ill and manifesting homicidal or other dangerous tendencies, and obtained the approval of the prosecuting attorney within 24 hours.

ports to permit the emergency detention pursuant to H.R.S. § 334–54 of an out-of-state patient of an out-of-state psychiatric facility, found in Hawaii, based solely on the fact of commitment elsewhere and not on any conduct of that person in Hawaii. That provision violates the federal constitution for the same reasons discussed above in relation to H.R.S. § 334–53.

## PROCEDURAL DUE PROCESS

Plaintiffs raise several issues relating to procedural due process in proceedings pursuant to H.R.S. § 334–53. In view of the court's conclusion that the section is unconstitutional on its face because it does not meet the requirements of substantive due process, the procedural issues need not be decided at this time. However, the developing case law in this area leaves little doubt but that Hawaii's mental health law does not meet the requirements of procedural due process even if a sufficient standard for commitment should be adopted. Therefore, these issues are discussed below.

■ In my opinion, due process in connection with the nonemergency nonconsensual commitment of persons pursuant to mental health laws requires that the person sought to be committed receive at a minimum the following procedural safeguards:

(A) Adequate prior notice.

(B) Prior hearing before a neutral judicial officer.

(C) The right to effective assistance of counsel.

(D) The right to be present at the hearing.

(E) The right to cross-examine witnesses and to offer evidence.

(F) Adherence to the rules of evidence applicable in criminal cases.

(G) The right to assert the privilege against self-incrimination.

(H) Proof beyond a reasonable doubt.

(I) A consideration of less restrictive alternatives.

(J) A record of the proceedings and written findings of fact.

(K) Appellate review.

(L) Periodic redeterminations of the basis for confinement.

(A) *Adequate prior notice.*

■ Notice must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must set forth with particularity the alleged conduct or condition upon which the proposed detention is based. *See In Re Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527, 550 (1967); *Bell v. Wayne County General Hospital at Eloise, supra,* at 1092. Besides date, time, and place of hearing, the notice should include a clear statement of the purpose of the proceedings and of the possible consequences to the subject thereof, a statement of the legal standard upon which commitment is authorized, the names of examining physicians and others who may testify in favor of detention and the substance of their proposed testimony. *Lessard v. Schmidt, supra,* at 1092; *Lynch v. Baxley, supra,* at 388; *State ex rel. Hawks v. Lazaro,* 202 S.E.2d 109, 124 (W.Va.1974).

The usual argument made against prior notice is that service of such legal papers on a mentally ill person would agitate him unnecessarily which is contrary to good medical practice. This presupposes that the individual is mentally ill, the very issue that must be determined before he may be deprived of his liberty. Nonconsensual commitment without notice is itself a traumatic experience, especially when the subject objects. On balance, a person's interest in liberty is more important than his interest in not being perturbed.

(B) *Prior hearing before a neutral judicial officer.*

■ *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119 (1970), reaffirmed the constitutional requirement of the Due Process Clause of the Fourteenth Amendment

that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event."

The same constitutional imperative applies when it is sought to deprive an individual of his liberty. *Lessard v. Schmidt, supra,* at 1091. In this context, emergency detention as discussed above would be an extraordinary situation justifying postponement of a hearing until after the event.

That a neutral judicial officer must conduct the hearing follows from our historical and political development as a people who distrust concentration of power in one person or one branch of government.[12] As was said in *McNabb v. United States,* 318 U.S. 332, 343–344, 63 S.Ct. 608, 614, 87 L.Ed. 819, 825 (1943), in an analogous context:

> A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication.

See also *Lessard v. Schmidt,* 379 F.Supp. 1376, 1379 (E.D.Wis.1974).

A more difficult question is whether the subject of the commitment proceedings is entitled to a jury trial. All three cited cases, *Lessard, Bell,* and *Lynch,* opt for a jury trial. The Wisconsin and Michigan statutes provide for a jury trial on demand of the respondent. In *Lynch,* the court held on Equal Protection grounds that inasmuch as Alabama had by statute granted the right to a jury trial in somewhat similar situations (on a writ of habeas corpus to determine sanity of a person already confined as insane), a jury trial had to be granted to those sought to be confined. *See also Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

On the other hand, the Supreme Court has held that trial by jury is neither a necessary element of the fundamental fairness guaranteed by the Due Process Clause nor an essential component of accurate fact-finding. *McKeiver v. Pennsylvania,* 403 U.S. 528, 543, 91 S.Ct. 1976, 1985, 29 L.Ed.2d 647, 659 (1971). Thus, jury trials have not yet been required as a matter of federal constitutional law in the adjudicative phase of a state juvenile court delinquency proceeding. Under Indiana's mental health law, the Supreme Court noted without comment that the hearing on mental illness is held before a judge. *See Jackson v. Indiana,* 406 U.S. 715, 722, 92 S.Ct. 1845, 1850, 32 L.Ed.2d 435, 441 (1972).

If civil commitment for mental illness is used as a method of detaining persons who might otherwise be charged with criminal conduct, the argument for the right to a jury trial becomes stronger. If civil commitment for mental illness is limited in time and treatment-oriented, the pressure for the right to a jury trial is less forceful.

---

12. The West Virginia procedure called for an initial determination of the need for hospitalization by a mental hygiene commission with a review by appeal to the circuit court. The appeal was to be handled "in the manner and within the time provided by law for civil appeals generally." *State ex rel. Hawks v. Laza-* ro, supra, at 127. As a result of this decision, the commission was required to operate in most respects like a court. *But see Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (Sixth Amendment requires public trial when liberty is in jeopardy).

In my opinion, a carefully drafted civil commitment statute may provide federal Due Process without providing for a jury trial.

(C) *The right to effective assistance of counsel.*

■ The right to effective assistance of counsel is a well-established element of due process in criminal proceedings. *Powell v. Alabama*, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158, 171 (1932); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin*, 407 U.S. 25, 37, 92 S.Ct. 2006, 2012, 32 L.Ed.2d 530, 538 (1972). The same right has been extended to include juvenile proceedings. *In Re Gault, supra.*

The reasoning of these cases applies to civil commitment cases as well. Several courts have expressly so stated. *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968); *Lynch v. Baxley, supra; Lessard v. Schmidt, supra; Dixon v. Attorney General of the Commonwealth of Pennsylvania*, 325 F.Supp. 966 (Md.Pa. 1971). These cases hold that the individual must be informed of his right to counsel, that counsel must be appointed if the individual cannot afford retained counsel, and that counsel must be made available far enough in advance of the hearing to provide adequate opportunity for preparation.

Appointment of a guardian *ad litem* is not a substitute for appointment of counsel. *Lessard v. Schmidt, supra*, at 1099–1100; *Lynch v. Baxley, supra*, at

389; *Quesnell v. State*, 517 P.2d 568 (Wash.1973).[13]

The current state of the law does not require provision in all cases for investigators and expert witnesses at public expense to assist in the defense of an indigent person subjected to a civil commitment proceeding, but it does not take much foresight to anticipate a trend in this direction.

(D) *The right to be present at the hearing.*

■ Due process requires the presence of the person proposed to be committed at all judicial proceedings conducted for that purpose. *See Specht v. Patterson*, 386 U.S. 605, 610, 87 S.Ct. 1209, 1212, 18 L.Ed.2d 326, 330 (1967). Waiver is possible but is valid only upon acceptance by the court following a judicial determination that the person understands his rights and is competent to waive them or that the person is so mentally or physically ill as to be incapable of attending the proceedings.[14] *Lynch v. Baxley, supra*, at 388–389. *See also In Re Gault, supra.*

■ The right to be present at the hearing necessarily includes the right to participate therein to the extent of the subject's ability. Due process is not accorded by a hearing in which the individual, though physically present, has no meaningful opportunity to participate because of incapacity caused by excessive or inappropriate medication. *Les-*

**13.** The court in *Lynch v. Baxley* did suggest that the constitutional right to counsel might be satisfied by appointment of a guardian *ad litem* "if, but only if, the appointed guardian is a licensed attorney and occupies a truly adversary position." *Id.* at 389.

**14.** In *State ex rel. Hawks v. Lazaro, supra*, at 125, the West Virginia Supreme Court of Appeals said that the "subject individual, just as a criminal defendant, must be present in person and cannot waive that right." I am of the opinion that this is a stricter requirement than what has been found in the Fourteenth

Amendment by the United States Supreme Court up to now.

In *Lynch v. Baxley, supra*, at 396, the court held that the "knowing and intelligent waiver of constitutional safeguards required in involuntary commitment proceedings is acceptable, provided that the waiver is made by counsel with the informed consent of the subject and with the approval of the court. When a waiver is proposed by counsel, but the subject is deemed incapable of giving his informed consent after appropriate inquiry and finding of facts, the court may approve such waiver for good cause shown." This is, of course, slippery ground.

*sard v. Schmidt, supra,* at 1092; *Lynch v. Baxley, supra,* at 389.

While a committing court may exclude a respondent where his presence makes it impossible to conduct the hearing in a reasonable manner, the court may not decide in advance of hearing and based solely on the certificates of physicians that the respondent shall not be allowed to appear. Some method alternative to total exclusion must be attempted first, such as conducting the proceedings at a psychiatric facility. *Bell v. Wayne County General Hospital at Eloise, supra,* at 1094.

(E) *The right to cross-examine witnesses and to offer evidence.*

██ Several separate elements of due process go together in the usual statements of procedural requirements. Thus, as stated in *Specht v. Patterson, supra,* 386 U.S. at 610, 87 S.Ct. at 1212, 18 L.Ed.2d at 330: "Due process . . . requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own." This includes the right to compel the attendance of witnesses. *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967). *See generally, Lynch v. Baxley, supra,* at 394.

Admittedly, this conjunction of procedural rights is not always required by the Due Process Clause. A prisoner does does not yet have the right in prison disciplinary proceedings to be confronted by or to cross-examine the persons who may give adverse information about the prisoner. *Wolff v. McDonnell,* 418 U.S. 539, 567–569, 94 S.Ct. 2963, 2980–2981, 41 L.Ed.2d 935, 957–958 (1974). In such situations, there are substantial state interests that justify a modification of the full due process requirements.

There are no comparable state interests in similarly restricting the rights of a person sought to be committed in a civil proceeding. The usual argument against a full-blown court hearing is that the conflicts, tensions, and pressures that develop in an adversary proceeding undermine the respondent's mental health. Limiting a person's constitutional rights on the theory that it is in his best interests is questionable philosophy and bad law.

(F) *Adherence to the rules of evidence applicable in criminal cases.*

██ To the extent that the rules of evidence are not merely technical or historical, but like the hearsay rule have a sound basis in human experience, they should not be rejected in any judicial inquiry. Note, *Juvenile Delinquents: The Police, State Courts, and Individualized Justice,* 79 Harv.L.Rev. 775, 795 (1966); *In Re Gault, supra,* at 11 n. 7; *Lessard v. Schmidt, supra,* at 1102–1103; *Lynch v. Baxley, supra,* at 394. More specifically, there shall not be any relaxation of the rules of evidence governing the use of hearsay. *See State ex rel. Hawks v. Lazaro, supra,* at 125.

(G) *The right to assert the privilege against self-incrimination.*

██ A decision as to whether the privilege against self-incrimination may be asserted in civil commitment cases involves conflicting policy considerations. On the one hand, statements coaxed out of a person might lead to indefinite deprivation of his liberty. On the other hand, the determination of and the course of treatment for mental illness are often based to a great extent on the subject's verbal responses.[15]

The resolution of the conflict is that if there is no other basis for depriving a

---

**15.** The Director of the Patuxent Institution, Maryland, argued that by refusing to talk to psychiatrists, a person referred for examination to determine whether he should be committed for an indefinite term as a defective delinquent had prevented the psychiatrists from evaluating the subject, making it impossible for the State to go forward with evidence at a hearing. *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 250, 92 S.Ct. 2083, 2087, 32 L.Ed.2d 719, 723 (1972).

person of his liberty than statements obtained from him for that purpose by an examining physician who has never seen him before, there should not be any order of commitment.[16]

 On strictly legal grounds, the privilege is not, of course, limited to criminal proceedings. *Murphy v. Waterfront Commission*, 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678, 704 (1968). As noted in *In Re Gault, supra*, at 49–50:

Against the application to juveniles of the right to silence, it is argued that juvenile proceedings are "civil" and not "criminal," and therefore the privilege should not apply. It is true that the statement of the privilege in the Fifth Amendment, which is applicable to the States by reason of the Fourteenth Amendment, is that no person "shall be compelled in any *criminal case* to be a witness against himself." However, it is also clear that the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the expo-

sure which it invites. The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory.

. . . [C]ommitment [of a juvenile] is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." And our Constitution guarantees that no person shall be "compelled" to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom.

 We must be clear about what the claim of the privilege against self-incrimination means in this context. It means that the state may not commit an individual on the basis (in whole or in part) of his statements to examining psychiatrists (or others) in the absence of a showing that the statements were made voluntarily after the individual was informed of and understood the purpose of the examination and that he was not obliged to speak.[17] It does not mean

**16.** In *State ex rel. Hawks v. Lazaro, supra*, at 126, the West Virginia Supreme Court of Appeals approved a statutory procedure for examination of a subject by a physician as part of the commitment process, saying: "The examination stage . . . is best conducted according to the direction of the examining physician and the presence of counsel, unless specifically invited by the physician, would be unduly burdensome to an objective evaluation of the individual's mental condition. In an adversary proceeding, the individual is entitled to introduce evidence from his own expert witnesses. To recognize the same rights against self-incrimination which would be required in a criminal proceeding would make almost any commitment impossible, and would make the procedures so burdensome that medical conclusions obtained through examination . . [in emergency detention situations] would be inadmissible. While complete justification for any deviation from normal civil and criminal due process standards must be demanded, it is unreasonable to hold that the State can never act in the best interest of an individual. There is justification for deviation in the case of emergency procedures where an individual's

life may be in jeopardy. . . . It would do a great disservice to individuals to make the procedural requirements so cumbersome that suicidal and maniacal individuals could never be hospitalized until they had injured themselves or others." I do not see the same consequences as flowing from the claim of the privilege.

**17.** I admit to having constructed my own synthesis of what I believe will be settled upon as the final statement of the law in this area.

In *Lessard v. Schmidt, supra*, at 1100–1102, the court thought "that the safeguards of the privilege may be obtained without the presence of counsel in the psychiatric interview. The patient should be told by counsel and the psychiatrist that he is going to be examined with regard to his mental condition, that the statements he may make may be the basis for commitment, and that he does not have to speak to the psychiatrist. Having been informed of this danger the patient may be examined if he willingly assents. . . . Basic fairness requires . . . that they be given notice of the fact that their statements may indeed tend to incriminate them in the eyes of

that psychiatrists cannot talk to a patient for purposes of treatment. It does not mean that evidence cannot be adduced as to the patient's statements in a non-inquisitorial setting.[18]

(H) *Proof beyond a reasonable doubt.*

■ The standard of proof required to prove that a person is committable may be either (1) by a preponderance of the evidence, (2) by clear and convincing evidence,[19] or beyond a reasonable doubt.

Proof by a preponderance of the evidence has been rejected. *Lessard v. Schmidt, supra,* at 1094–1095; *In re Ballay,* 157 U.S.App.D.C. 59, 482 F.2d 648 (1973).

Proof by clear and convincing evidence has been approved. *Lynch v. Baxley, supra,* at 393; *State ex rel. Hawks v. Lazaro, supra,* at 126–127. *Cf. Woodby v. Immigration Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation proceedings).

Proof beyond a reasonable doubt has been required. *Lessard v. Schmidt, supra,* at 1095; *In re Ballay, supra; Unit-*

*ed States ex rel. Stachulak v. Coughlin,* 520 F.2d 931, 935–937 (7th Cir. 1975). *Cf. In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (juvenile proceedings). *See In re Gault, supra.*

I find the reasoning of *In re Ballay* most persuasive and adopt that court's conclusion that the standard of proof in nonconsensual civil commitment proceedings must be beyond a reasonable doubt.

(I) *A consideration of less restrictive alternatives.*

*Lessard v. Schmidt, supra,* set out the requirement that less drastic means than commitment be investigated. The court said:

> We believe that the person recommending full-time involuntary hospitalization must bear the burden of proving (1) what alternatives are available; (2) what alternatives were investigated; and (3) why the investigated alternatives were not deemed suitable. These alternatives include voluntary or court-ordered out-patient treatment, day treatment in a hospital, night treatment in a hospital, placement in the custody of a friend or relative, placement in a nursing home,

the psychiatrist and the trier of fact in a civil commitment proceeding." This seems to me to be an unnecessary gloss on the general proposition.

The *Lessard* court also injected a refinement built around the word "knowledge," in the requirement that, to be admissible, statements to psychiatrists must be made with "knowledge" that the individual was not obliged to speak. By footnote 33 on page 1101 the court explained: "We use the term knowledge advisedly. The presumption in a civil commitment proceeding must be that the individual is indeed competent. If his rights are explained to him in simple terms it may be presumed that he has the requisite knowledge. If the individual in fact does not have this knowledge because of mental illness a subsequent finding of mental illness or mental incapacity on the basis of his statements cannot be said to violate due process. [!?] The state will be obliged to prove that he is dangerous in order to sustain a recommendation of commitment." In my opinion, this limitation on the privilege against self-incrimination is unworkable in practice.

In *Lynch v. Baxley, supra,* at 394, it is not clear that the court is talking about the same

privilege when it says that the privilege "protects any disclosures which the subject may reasonably believe could be used in a criminal prosecution or which could lead to other evidence that might be so used." What about disclosures that could be used in the commitment proceeding? It goes almost without saying that statements during a psychiatric interview that might tend to incriminate the person in some criminal activity cannot be used in a criminal proceeding without satisfying the usual conditions for admissibility.

I have adopted the position of Justice Douglas in his concurring opinion in *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 257, 92 S.Ct. 2083, 2090, 32 L.Ed.2d 719, 727 (1972).

18. A person's personal physician may be prevented from testifying for the state because of a physician-patient privilege claimed by or on behalf of the patient.

19. Sometimes stated as "clear, unequivocal and convincing evidence," or "clear, cogent and convincing." In my opinion, the extra adjective adds nothing to the meaning.

referral to a community mental health clinic, and home health aide services. *Id.* at 1096.

The same requirement was stated in *Lynch v. Baxley, supra,* thusly:

> In addition to the findings which are required to be made by the fact-finder, the state . . . shall have the burden of demonstrating that the proposed commitment is to the least restrictive environment consistent with the needs of the person to be committed. *Id.* at 392.

*Cf. Welsch v. Likins,* 373 F.Supp. 487, 502 (D.Minn.1974). *O'Connor v. Donaldson, supra (semble).*

These holdings derive from the basic principle expressed in *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960) that

> . . . even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

(J) *A record of the proceedings and written findings of fact.*

*Specht v. Patterson, supra,* 386 U.S. at 610, 87 S.Ct. at 1212, 18 L.Ed.2d at 330, held that in proceedings under Colorado's Sex Offenders Act, due process required, among other things, that "there must be findings adequate to make meaningful any appeal that is allowed."

*Lynch v. Baxley, supra,* at 396, stated the requirement, in civil commitment proceedings, as calling for a "full record of the commitment proceedings, including findings adequate for review."

■ Obviously there can be no meaningful monitoring of civil commitment proceedings without a record of the proceedings and written findings by the decision-making officer, and without the possibility of such monitoring, there can be no meaningful determination as to whether an individual has been accorded his constitutional rights of substantive and procedural due process. *See State ex rel. Hawks v. Lazaro, supra,* at 127.

(K) *Appellate review.*

Appellate review of civil commitment orders may not be constitutionally mandated but is certainly desirable.

Due process of law does not require a state to afford review of criminal judgments. *Griffin v. Illinois,* 351 U.S. 12, 20, 21, 76 S.Ct. 585, 591, 100 L.Ed. 891, 900 (1956) (concurring opinion of Justice Frankfurter).

Whether or not the right to appeal is constitutionally mandated, the wisdom of providing a system of appeals in criminal cases is generally admitted. As was said in *Coppedge v. United States,* 369 U.S. 438, 455–456, 82 S.Ct. 917, 926, 8 L.Ed.2d 21, 34 (1962) (concurring opinion of Justice Stewart); "Justice demands an independent and objective assessment of a district judge's appraisal of his own conduct of a criminal trial." Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L. Rev. 441, 453 (1963), expresses the consensus as follows:

> The possibilities of error, oversight, arbitrariness and even venality in any human institution are such that subjecting decisions to review of some kind answers a felt need; it would simply go against the grain, today, to make a matter as sensitive as a criminal conviction subject to unchecked determination by a single institution.

■ Once an appeal is allowed, so also must provision be made for counsel on appeal, a transcript of the proceedings and of the record on appeal at public expense for those unable to pay these costs. *See Coppedge v. United States, supra.*

No doubt provision can be made for commitment pending appeal in the event the hearing ends in an order of commitment.

(L) *Periodic redeterminations of the basis for confinement.*

*O'Connor v. Donaldson, supra,* at 574–575 holds that even if the original confinement under a mental health law was founded upon a constitutionally adequate

basis and was initially permissible, it could not constitutionally continue after that basis no longer existed.

This seems to put the burden on the state to reestablish from time to time the basis for continued confinement.

Under H.R.S. § 334–81 to 334–86, a patient confined in a psychiatric facility may obtain a judicial determination as of right every six months of the need for his continued hospitalization by order to show cause directed to his custodian.

 I construe H.R.S. § 334–82 as placing the burden of proof on the custodian, which is where it ought to be if my reading of *O'Connor v. Donaldson* is correct.

 The granting, or limiting, of the right to a review by order to show cause to not oftener than once in a period of six months, as provided by H.R.S. § 334–85, does not seem unreasonable. The West Virginia statute discussed in *State ex rel. Hawks v. Lazaro, supra,* permitted a first reexamination after six months of hospitalization and at intervals of one year thereafter. A determination that the patient is in need of continued hospitalization does not affect his availability for discharge under H.R.S. § 334–76.

 The basis for the need for continued hospitalization must be the same as required for an original confinement. This clearly follows from the holding of *O'Connor v. Donaldson.* To this extent, the language of H.R.S. § 334–81 and of H.R.S. § 334–76 should be revised. But even without such revision, the phrase "needs continued hospitalization" in H.R.S. § 334–84 can and must be read to mean "is still subject to commitment," and the mandatory provision of H.R.S. § 334–76(1) can and must be read to mean that the custodian or responsible physician shall discharge a patient "when the basis for the original commitment no longer exists," when applied to nonconsensual civil commitment by court order.

 It may be noted that the statutory provisions for review are not exclusive. A patient still has his remedy by way of habeas corpus. In that event, however, the burden would be on him to establish by a preponderance of the evidence that he should be released.

 The fact that the patient or someone on his behalf must request an order to show cause why he should not be released rather than that the state must request a determination that the patient should not be released does not appear to me to be violative of the patient's due process rights. The statutory procedure is very simple, is without cost, and may be put into motion by any responsible person.

A statutory provision limiting confinement to a period of 90 days without another commitment hearing would, in my opinion, meet all constitutional objections in this regard and is in line with current mental health doctrine.

## EQUAL PROTECTION OF THE LAWS

Plaintiffs claim that the civil commitment procedure under H.R.S. Chap. 334 denies them the equal protection of the laws guaranteed by the Fourteenth Amendment because this procedure is less formal than the procedure followed in committing persons charged with crime as authorized by H.R.S. Chap. 704.

In view of the court's decision on plaintiffs' due process claims, it is not necessary to reach this equal protection claim.[20]

## MOOTNESS

 The fact that none of the named plaintiffs is still confined as a result of proceedings under H.R.S. Chap. 334 does not make the case moot. The history of each named plaintiff is such that the likelihood of each of them again being subjected to commitment pursuant to the statute is not so remote as to bar this challenge. *In re Ballay, supra,* at 651. The case is also "rescued from the

---

**20.** I do not read plaintiffs' equal protection claim as extending to H.R.S. § 334–54.

doom of mootness" by its class action aspect. *Medynski v. Margolis,* 389 F.Supp. 743, 748 (D.D.C.1975) (three-judge court) (concurring opinion of Circuit Judge Robinson).

## SUMMARY

The court is fully aware of the implications of a return to the "legal model" as opposed to the "medical model" in civil commitment cases. Having served for five years as a district magistrate for the City and County of Honolulu in the district where the state hospital for the mentally ill is located, and after that for several years as a circuit judge in the family court to which civil commitment proceedings were transferred, and having chaired the committee that drafted Hawaii's current mental health law, I can assert with some authority that whatever the legal framework, the actuality will depend upon many other factors. The overriding consideration behind recent cases that have struck down the relaxed procedures for hospitalizing a person for mental illness whether or not he consented has been that personal freedom is involved. A close second consideration has been that the diagnosis and treatment of mental illness leave too much to subjective choices by less than neutral individuals. In this Bicentennial Year celebrating among other things the

declaration that all men are endowed by their Creator with the unalienable rights of Life, Liberty and the Pursuit of Happiness, a state law authorizing the indefinite detention by force of an individual solely on the certificates of two physicians stating that the individual is so mentally ill that he needs hospitalization, cannot be sustained.

For the reasons set out above, I conclude that H.R.S. § 334–53, the nonconsensual conversion feature of H.R.S. § 334–54(f), the transfer provisions of H.R.S. § 334–71 and of H.R.S. § 334–73, and the authorizations set out in H.R.S. § 334–51(a)(2) and (5), as written and as applied, are in violation of the Due Process Clause of the Fourteenth Amendment.

I further conclude that H.R.S. § 334–54 and the authorization set out in H.R.S. § 334–51(a)(3), as construed and applied, do not violate the Fourteenth Amendment.

I further conclude that H.R.S. § 334–76 and H.R.S. § 334–81 must be read as being restricted by the limitations imposed by *O'Connor v. Donaldson.*[21]

Declaratory and injunctive relief will be granted in accordance with the foregoing. The court will accept suggestions as to the form of the judgment, including any transitional provisions.[22]

---

21. The standard for mandatory release in H.R.S. § 334–76(1), which is stated as being "when . . . the patient is no longer mentally ill or habituated to the excessive use of drugs or alcohol," must, in the case of persons committed by court order as a result of civil proceedings, be interpreted to mean "when the basis for the original commitment no longer exists." There is no prohibition, of course, against a nonconsenting detainee becoming a voluntary patient, although the change in status, if made, should be well documented and witnessed.

The standard for an order authorizing continued detention in H.R.S. § 334–84, which is stated as being "the patient needs continued hospitalization," must be interpreted to mean "is still subject to commitment."

The provisions of H.R.S. §§ 334–81 to 334–86 only apply, of course, to someone who is being detained without his consent. A volun-

tary patient, "other than one habituated to the excessive use of drugs or alcohol," admitted pursuant to H.R.S. § 334–52, cannot be detained at the facility more than five days after he makes written request for his discharge. The admitting facility may require as a condition of admission of any person habituated to the excessive use of drugs or alcohol that the person shall agree to remain for not less than ninety days. If Hawaii's mental health law is to be revised, this 5-day and 90-day agreement to be involuntarily detained should be given careful reconsideration.

22. *See, e. g.,* the Order of Judgment entered in *Lessard v. Schmidt,* 379 F.Supp. 1376 (E.D. Wis.1974); the Order for Partial Summary Judgment entered in *Bell v. Wayne County General Hospital at Eloise, supra,* at 1101–1102, and the final paragraphs of *Lynch v. Baxley, supra,* at 397, and *State ex rel. Hawks v. Lazaro, supra,* at 128.